HARRY RAVITCH *v.* STOLLMAN POULTRY FARMS, INC., ET AL.

HOUSE, C. J., SHAPIRO, LOISELLE, MACDONALD and BOGDANSKI, Js.

Argued May 4—decided June 7, 1973

*Jerome M. Griner,* for the appellant (plaintiff).
*William R. Moller,* for the appellees (defendants).

SHAPIRO, J.  The plaintiff, Harry Ravitch, commenced this action nearly ten years ago.  In his complaint Ravitch alleged that on March 5, 1963, he and the defendant Hyman Stollman entered into

a written contract pursuant to which Ravitch had quitclaimed his interest in substantial parcels of realty located in Durham, Middletown and East Hampton. The plaintiff, who claimed that he was previously the owner of these parcels, alleged that the defendant Stollman had acquired title to said properties either in his own name or in the name of the Stollman Poultry Farms, Inc., a corporation of which the defendant Stollman was principal owner and shareholder. The defendant Stollman's breach of the contract was alleged to be a failure to account to the plaintiff regarding the properties in accordance with the provisions of the agreement. The complaint was subsequently amended to include a second count alleging fraud and unjust enrichment, a claim for the imposition of a constructive trust, and an ad damnum claim raising the original claim of damages from $200,000 to $1,000,000.[1]

By stipulation of the parties, the case was referred to a state referee for trial in 1969, and on March 20, 1972, the referee, acting as the court, rendered judgment for the defendants. The plaintiff's primary issue on appeal challenges the interpretation of certain contract provisions relating to the time at which performance was due under the terms of the contract. The court found that the plaintiff failed to fulfill a condition precedent to the defendant Stollman's performance and that this failure of the plaintiff to perform excused the defendant Stollman

---

[1] A motion was made by the plaintiff to set aside the judgment or to grant a new trial on the ground that the referee's judgment was rendered too late under the provisions of General Statutes § 51-29. This was denied by the court and an appeal taken therefrom. In view, however, of our recent opinion in *Florida Hill Road Corporation* v. *Commissioner of Agriculture & Natural Resources*, 164 Conn. 360, 365, 321 A.2d 856, the plaintiff in argument before this court has abandoned any claim made thereon.

from his obligations under the contract. The court also concluded that the defendant Stollman's conduct was not fraudulent.[2]

The material terms of the contract are set out in the footnote.[3] Some background information will serve to explain the nature of the transaction. The plaintiff had for many years been engaged in the

[2] A motion was made that this court order the defendants' brief stricken owing to its improper contents. The brief, full of indecorous epithets and irrelevant episodes, might well have been ordered stricken; Practice Book § 692, *Pradlik* v. *State,* 131 Conn. 682, 683 n., 41 A.2d 906, *Pierce* v. *Norton,* 82 Conn. 441, 442 n., 74 A. 686, *Kirbell* v. *Pitkin,* 75 Conn. 301, 302 n., 53 A. 587; but in view of the decade of litigation and the wasteful expense of court and counsels' time, the motion was denied. The denial of the motion is not to be understood as condonation of the vituperative contents of this brief.

[3]                                                       "March 5, 1963

Mr. Hyman Stollman:

I do hereby make the following proposal:

1. That all of my personal obligations and liabilities are fully and correctly set forth on Exhibit "A," attached hereto.

2. That as of this date I am the record owner of the several parcels of real estate set forth and described on Exhibit B, attached hereto, but that foreclosure actions have been instituted and are now pending against said properties.

3. That I have today executed quit claim deeds conveying to you all of said properties upon the following terms and conditions:

(a) That Hyman Stollman shall have thirty (30) days from date of this instrument to effect a settlement with creditors set forth on Exhibit "A," and if said settlement has not been effected within said thirty (30) day period then said Harry Ravitch shall forthwith file an arrangement under Chapter XI of the Bankruptcy Act in which a cash settlement will be made with funds to be provided by you with all of the said creditors for approximately 15% in full to each of said creditors.

(b) That arrangements will be made by you with all of the present foreclosing mortgagees for the withdrawal of all pending foreclosures either by cash, by new mortgages or otherwise, so that the equity in all of said properties may be preserved.

.          .          .          .          .

(f) You are to have the absolute and sole discretion as to any decision to be made with respect to the disposition of any or all of

business of raising chickens and of egg production. During the period from 1958 to 1963, he purchased from the defendant the Stollman Poultry Farms, Inc., over $200,000 worth of "started" pullets. The defendant Stollman, a seasoned poultryman, was primarily engaged in raising hatched chicks to the age of ten or twelve weeks, at which time they reached their egg-laying cycle. At maturity, the "started" pullets would be sold to an egg producer such as the plaintiff.

said properties by you, and I agree to promptly execute any and all instruments that may be required to be executed by me in connection with the entire within proposal.

(g) Upon acceptance of the within proposal you agree that I shall receive the sum of $15,000.00 payable: $5,000.00 to be deposited in escrow with Louis Evans and Myron Bernstein and to be paid by them to me five months after the settlement with creditors has been completed and/or the Chapter XI Proceeding has been confirmed by the Referee in Bankruptcy, $5,000.00 on January 2, 1964, and $5,000.00 on January 2, 1965. Simultaneously with the said first payment of $5,000.00 you will also pay to Louis Evans the sum of $1,500.00 due to him for legal services.

(h) You are to proceed, as aforesaid, to convert all of said properties and personal assets into cash and out of the proceeds thereof you are to repay to yourself in the following order: all monies advanced by you to settle with creditors, all monies advanced by you to settle or refinance with all of said mortgagees, the aforesaid sum of $15,000.00 (without interest) which you are to pay to me, and the sum of $200,000.00 due to you (without interest).

(i) All monies and income received from said properties shall be so applied by you and when all of said payments shall have been so made by you, all remaining assets and/or monies then on hand shall be equally divided between you and me.

(j) In no event shall I be liable to you for any deficiencies resulting from the liquidation of said assets.

(k) It is understood that the within proposal fully sets forth and includes our entire agreement reached after discussion and conference between us that upon acceptance and approval by you this instrument shall be binding upon all of our heirs, executors, administrators and assigns.

Dated at New Haven, Connecticut, this 5th day of March, 1963.

HARRY RAVITCH"

From 1958 through 1961, the plaintiff was in arrears in payments due the defendant's corporation totaling nearly $150,000. The defendant Stollman was frequently seeking from the plaintiff personal security for the sums overdue as well as payment. After beginning a new but ill-fated egg production operation at Aspinnok Mill, a converted textile mill, the plaintiff purchased even more pullets from the defendant the Stollman Poultry Farms, Inc. The defendant Stollman delivered over 100,000 pullets between June and November, 1961, to the mill. The plaintiff, during these five months, thwarted the defendant Stollman's attempts to obtain security for these sales. Finally, on November 28, 1961, the plaintiff signed a voucher as president of Middlesex Farms, Inc., indicating a debt for purchases from the defendant Stollman for $287,000. Some payments were made on this bill, the last of these leaving the total indebtedness of the plaintiff to the defendant Stollman at $234,551.50 in September, 1962. At the end of 1962, the plaintiff had reneged on a promise to give notes and mortgage deeds to the defendant Stollman as security for his debts. At that time the plaintiff's personal financial situation and that of his corporation, Middlesex Poultry Farms, Inc., were desperate; together, their indebtedness, including the sum owed to the defendant Stollman, was $792,282.48. The plaintiff's assets consisted primarily of the parcels of real estate in Durham, Middletown and East Hampton. One parcel, located in East Hampton, contained from forty-seven to sixty acres; the other, located mostly in Durham but partly in Middletown, contained some 135 acres and had several buildings, including the plaintiff's residence. Both parcels of property were so heavily mortgaged that there was no equity in

them at the time they were transferred to the defendant Stollman in March, 1963.

On January 14, 1963, the Delaware Milling Company, the plaintiff's second largest creditor, brought suit on its claim for feed and attached the two parcels for $100,000. The defendant the Stollman Poultry Farms, Inc., followed suit on January 17, 1963, by attaching the same parcels for $250,000. The defendant Stollman's claim, like that of the Delaware Milling Company, was that the plaintiff had undertaken personal liability for produce sold to Middlesex Farms, Inc. Within a month, three foreclosure actions were commenced on the Durham-Middletown parcel which related to mortgages in an amount totaling $72,500, and one foreclosure action was brought against the East Hampton parcel, which related to a mortgage for $30,000. Middlesex Farms, Inc., had filed a voluntary petition in bankruptcy on January 30, 1963, and the question arose whether the plaintiff would follow the fate of his corporation. In view of the possibility that the plaintiff could escape involuntary bankruptcy by claiming the status of a farmer,[4] it was clear that voluntary bankruptcy by the plaintiff or a settlement with creditors were the only courses open. At this juncture, it was obvious that the only hope for the creditors to retrieve any of their losses was to look to the real estate. The defendant Stollman was the largest creditor and the Delaware Milling Company was next with a claim listed by the plaintiff at $80,000 but claimed by the Delaware Milling Company to be substantially more. In a list later furnished to the defendant Stollman, the plaintiff conceded personal obligations in an amount of $436,089.94.

[4] See 52 Stat. 913, 11 U.S.C. § 779.

It was in this setting that the parties and their attorneys negotiated the terms of the contract which is now in dispute. The remaining account contains the court's findings with such corrections to which the plaintiff is entitled. In March, 1963, the defendant Stollman's attorneys, Myron Bernstein and Thomas Cambria, met with Attorney Louis Evans, who was counsel for the plaintiff, in Evans' office. Attorney Bernstein had outlined a proposal which involved placing title to the plaintiff's real property in the defendant Stollman, arranging for a settlement with creditors, liquidating the property, satisfying the defendant Stollman's claim and dividing the remainder. At a later meeting on March 5, 1963, the parties and their counsel met again at Attorney Evans' office. Evans, as the plaintiff's attorney, drew up the contract while the parties waited; the quitclaim deeds referred to in the agreement were executed and delivered. Essentially, this agreement provided for a two-step operation. First, the defendant Stollman was to have thirty days in which to attempt a common-law settlement with the creditors. If this failed, the plaintiff was to file "forthwith" a petition for an arrangement under chapter 11 of the Bankruptcy Act.[5] Plainly, the chapter 11 petition would have to be filed before May 15, 1963, in order to defeat the Delaware Milling Company's attachment on the plaintiff's property filed four months earlier. The plaintiff does not dispute the fact that the defendant Stollman and his attorneys conferred with the attorney representing the plain-

---

[5] Chapter 11 of the Bankruptcy Act is found in 52 Stat. 905–916, as amended, 11 U.S.C. §§ 701–799. Essentially, these provisions give an insolvent debtor the opportunity to reach a composition or arrangement with creditors, overseen by the court, rather than be branded with the stigma of bankruptcy. *In re Conway,* 121 F.2d 972 (3d Cir.).

tiff's second largest creditor, the Delaware Milling Company, in an attempt to work out a 15 percent settlement. The plaintiff, meanwhile, had left his home and was living in New York, where it was difficult to reach him. He made no effort to cooperate in the adjustment of any of the claims or to keep in touch with the progress of the execution of the contract. The attempted settlement with creditors was a failure and the plaintiff's attorney, Evans, was so advised. The plaintiff, nevertheless, adamantly refused to file the chapter 11 petition. At a meeting on May 13, 1963, the plaintiff made his position clear and the parties separated with the understanding that "everything was off" under the contract. Efforts to persuade the plaintiff to take any action were fruitless. Until this action was brought in August, 1963, there were no more communications between the parties.

The plaintiff attacks the court's ultimate conclusion that his failure to file a petition for an arrangement in federal court excused the defendant Stollman from further performance. His claim is that the defendant Stollman had a preceding obligation (1) to have the foreclosure actions withdrawn and (2) to deposit $5000 in escrow for the plaintiff's benefit. In addition to these claims, the only serious corrections which the plaintiff seeks in the finding and which he pursues in his brief pertain to the court's interpretation of the written contract. The plaintiff claims that several of the court's findings which declare the meaning of certain provisions of the contract are without evidence. As matters of judicial interpretation, these findings, which are more properly conclusions, find ample support in the unattacked findings of fact, narrated above, which relate the history, purpose and intentions

behind the agreement.[6]   Further assignments of error relate to a rule of construction, and to a ruling on evidence.

Paragraph 3 (a) of the contract of March 5, 1963, provides that if the proposed settlement with creditors "has not been effected within said thirty (30) day period then said Harry Ravitch shall forthwith file an arrangement under Chapter XI of the Bankruptcy Act."   As the court construed this section, the failure of the defendant Stollman's attempts to reach a settlement agreement with the other creditors of the plaintiff made it necessary for the plaintiff to file the petition under chapter 11 "forthwith." This was an essential and indispensable act in carrying out the purposes of the contract in view of the attachments filed in January amounting to some $350,000, the plaintiff's admitted personal liabilities of $436,089.94, and the mortgages under foreclosure whose face value was over $100,000.   The plaintiff argues, however, that with respect to the filing of the arrangement under chapter 11 of the Bankruptcy Act, it was to be a cooperative effort between the defendants' counsel, Attorney Cambria, and the plaintiff's counsel, Attorney Evans.   Since Attorney Cambria never initiated the action or called the plaintiff's counsel, the plaintiff now asserts that he was excused from compliance with this condition. We note that paragraph 3 (a) of the contract sets out terms under which a cash settlement under the

---

[6] Our determination of the validity of the plaintiff's challenge to the findings properly ignores the appendix to the defendants' brief. The plaintiff, pursuant to Practice Book § 641, filed and had certified barely 100 of the 5400 pages of the transcript. The defendants, however, failed to file and to have certified additional portions of the transcript on which they rely and to which they refer in their appendix.   This failure violates § 716 of the Practice Book and renders the defendants' appendix worthless.

contemplated chapter 11 arrangement was to have been made with funds provided by the defendant Stollman. This provision, however, does not vitiate the court's conclusion that the agreement contemplated that the plaintiff himself would initiate the proceedings by filing the appropriate papers in the bankruptcy court.[7] As the court interpreted the provisions of paragraph 3 (a), the payment of any moneys pursuant to the contract could not reasonably be expected until the plaintiff filed appropriate papers under chapter 11 of the Bankruptcy Act. Despite the plaintiff's insistence that this interpretation is unwarranted, the language of the contract and the background against which it was negotiated bear out this view. Furthermore, even though there is no showing that the defendant Stollman actually offered the funds, the court found, and the plaintiff does not dispute, that the defendant Stollman was at all times able and ready to deposit the necessary funds. If the plaintiff deemed the deposit of such funds a prerequisite for his performance he could have provided for that contingency in the contract. Not only did the plaintiff fail to do this, but his actions in leaving for New York and in failing to communicate with the defendant Stollman suggest a serious lack of good faith on his part to abide by the agreement or to cooperate in its execution.

Although the contract did not spell out the precise details as to the time and manner of performance, the court was guided toward its conclusion by an accepted rule of construction. That rule tilts the balance against the party who actually drew the contract whenever two interpretations of a contrac-

---

[7] Certainly there is no requirement in chapter 11 that the petition be accompanied with the funds for the proposed arrangement when it is filed. See 52 Stat. 907, as amended, 11 U.S.C. §§ 723, 724.

tual provision seem equally possible. See *Greenwich Construction Co.* v. *Bonwit Construction Co.*, 156 Conn. 123, 129, 239 A.2d 519; *Wall* v. *Wason*, 146 Conn. 32, 36, 147 A.2d 200; *Dorne* v. *Williams*, 140 Conn. 193, 201, 98 A.2d 796; 4 Williston, Contracts (3d Ed. Jaeger) § 621. The plaintiff contends that this rule is inapplicable in a situation where, as here, the contract was drawn up in response to the other party's written proposals, after a lengthy negotiation and while the parties sat in his attorney's office awaiting it. The plaintiff misses the point of the rule, however, which recognizes that the draftsman's choice of words, the precise phrases and their order are critical elements in the judicial interpretation of contracts.[8]

The second claim of the plaintiff involves paragraph 3 (b) of the contract, a provision to the effect that the defendant Stollman would make arrangements with all of the foreclosing mortgagees "for the withdrawal of all pending foreclosures either by cash, by new mortgages or otherwise, so that the equity in all of said properties may be preserved." Once again, no specific time was set down in the

---

[8] The premise operating behind the rule would seem to be a psychological one. The party who actually does the writing of an instrument will presumably be guided by his own interests and goals in the transaction. He may choose shadings of expression, words more specific or more imprecise, according to the dictates of these interests. What may seem perfectly unambiguous at the time of the writing, however, will often be the subject matter of future litigation. For such occasions, the courts have adopted a rule fairly to balance the natural tendency of the draftsman to favor his own interests. Professor Williston has a different rationalization for the rule: "Since one who speaks or writes, can by exactness of expression more easily prevent mistakes in meaning, than one with whom he is dealing, doubts arising from ambiguity of language are resolved in favor of the latter." 4 Williston, Contracts (3d Ed. Jaeger) § 621, pp. 760–61.

contract for the defendant Stollman's performance of this provision. The defendant Stollman, nevertheless, conceded that performance under this paragraph was contemplated to take place within the first thirty-day period of the contract. In fact, the defendant Stollman redeemed the property from foreclosure some time after the thirty-day period at his expense in the sum of $97,444.85 with interest. In addition, he paid $30,000 to extinguish the claim of the Delaware Milling Company, which had placed an attachment on the property. Contrary to the plaintiff's contention, the court did not find that the defendant Stollman's failure to have the foreclosures withdrawn within the thirty-day period constituted a material breach. The justification for this tacit conclusion is, however, apparent from the finding. In paragraph 3 (f) of the instrument, the plaintiff had relinquished to the defendant Stollman "absolute and sole discretion as to any decision to be made with respect to the disposition of any or all of said properties." Coupled with the undisputed fact that there was no equity in the property to be saved at the time withdrawal of the mortgages was contemplated, this provision in the instrument makes the defendant Stollman's decision to redeem rather than to seek withdrawal of pending foreclosures an acceptable performance. As paragraphs 3 (b) and 3 (h) indicate, the primary purpose of those provisions was to preserve the land, the major asset, and primarily to repay the defendant Stollman for moneys advanced by him in settlement with creditors and mortgagees and second, to pay the agreed sum of $15,000 to the plaintiff and to satisfy the defendant Stollman's original claim of $200,000. The time when the land was saved for this purpose has not been shown to affect the plaintiff's interest nor

to have altered his obligations in any way. Although mere delay in rendering a promised performance may be so material as to justify total abandonment, in most cases performance at an exact time is not "of the essence." See 6 Corbin, Contracts § 1253, p. 10, and cases cited. The point remains that, although the foreclosures went to judgment, the defendant Stollman preserved the equity completely and that it was to this critical effect that paragraph 3 (b) of the agreement looked.

The third claimed breach on the part of the defendant Stollman relates to paragraph 3 (g) of the contract. Under this clause, the plaintiff was to "receive the sum of $15,000.00 payable: $5000.00, to be deposited in escrow with [the plaintiff's attorney] Louis Evans and [the defendant Stollman's attorney] Myron Bernstein and to be paid by them to . . . [the plaintiff] five months after the settlement with creditors has been completed and/or the Chapter XI Proceeding has been confirmed by the Referee in Bankruptcy, $5,000.00 on January 2, 1964, and $5,000.00 on January 2, 1965." Simultaneously, with the first payment (as opposed to the deposit) of $5000, the defendant Stollman agreed to pay Attorney Evans the sum of $1500 for legal services. Again, the contract left unstated the precise time when the deposit of $5000 in escrow was to be made. Although the plaintiff never made a request or demand that the defendant Stollman deposit the money on March 5 or that he pay any of the moneys referred to in paragraph 3 (g), it was his claim at the trial, several years later, that the defendant Stollman should have done so on the day the contract was executed. The defendant Stollman contended, however, that paragraph 3 (g) did not contemplate performance by him until the plaintiff had filed his

petition under the Bankruptcy Act. Given the absence in the instrument of a specific date for performance and the plaintiff's failure to seek the deposit or the payment of the moneys at the time of execution, the court interpreted paragraph 3 (g) in accordance with the defendant Stollman's position.

We find no error in the court's conclusion that it was the plaintiff's rather than the defendant Stollman's failure to perform which excused the other party from his obligation under the contract. Whether the performance of a certain act by a party to a contract is a condition precedent to the duty of the other party to act depends on the intent of the parties as expressed in the contract and read in light of the circumstances surrounding the execution of the instrument. *Brauer* v. *Freccia,* 159 Conn. 289, 293, 268 A.2d 645; *Strimiska* v. *Yates,* 158 Conn. 179, 185, 257 A.2d 814; *McIsaac* v. *Hale,* 104 Conn. 374, 379, 132 A. 916; 5A Corbin, Contracts § 1175, p. 294. Given the ambiguities and lack of clarity in the disputed provisions of the instrument here, the complex history in which it arose and the rule of construction correctly applied by the court, we conclude that the court arrived at a fair and reasonable interpretation of the several disputed provisions of the contract. See *Lach* v. *Cahill,* 138 Conn. 418, 421, 85 A.2d 48. The court, therefore, having found that the plaintiff's performance was a condition precedent to the defendant Stollman's obligation, properly denied the requested relief to the plaintiff. A party cannot recover on a contract unless he has fully performed his obligations under it, has tendered performance, or has some legal excuse for not performing. *Automobile Ins. Co.* v. *Model Family Laundries, Inc.,* 133 Conn. 433, 437, 52 A.2d 137; *Pratt* v. *Dunlap,* 85 Conn. 180, 183, 82 A. 195;

17 Am. Jur. 2d, Contracts, § 361. The attack on the court's conclusion that the defendant Stollman's conduct was not fraudulent has been abandoned on appeal, and the plaintiff's claim for a constructive trust falls for lack of foundation. See *Van Auken v. Tyrrell*, 130 Conn. 289, 290–91, 33 A.2d 339.

The plaintiff's final assignment of error relates to a ruling on evidence. The defendant Stollman produced a witness who, for many years, had been in the business of producing eggs. In response to a question asking whether he learned of the plaintiff's reputation in the Durham community for truth and veracity, he answered that the plaintiff "was a big time operator, and he could sell anybody the Brooklyn Bridge if he put his mind to it." On objection to the answer, the court responded that it was a characterization stated in colloquial terms. The plaintiff requested and was granted an exception. In its ruling, the court observed that the witness had manifested in earlier testimony his poor opinion of the plaintiff; his answer to the present question, the court noted, was affected by this opinion adversely to the plaintiff. Further, the trier considered the answer flippant and evasive and disregarded it as having no weight in the consideration of the case.

Some casual remarks of the trial court incident to this ruling are another target of attack. The court, observing that the witness was using a colloquialism, answered the plaintiff's objection: "It's an old time expression, and I'm going to allow it, because I think the Supreme Court, when they review this thing, will recognize it." Seizing upon the quoted words, the plaintiff complains that the trial court showed partiality and prejudgment against his case.

We consider these offhand remarks of the court in announcing an interlocutory ruling, as having been made within the context of a heated, protracted trial. From this point of view the trial court's casual comment, by itself, is not a proper target for such minute criticism. *Fuller* v. *Johnson,* 80 Conn. 493, 497, 68 A. 977.

One other point requiring brief discussion concerns the claim made by the plaintiff that an earlier granting by the court of the defendant Stollman's motion for partial release of the lis pendens showed prejudicial prejudgment of the merits of the case by virtue of our holding in *Ravitch* v. *Stollman Poultry Farms, Inc.,* 162 Conn. 26, 291 A.2d 213. That matter involved the single question whether a referee, acting as a court, exceeded his powers in ordering the partial release of an attachment while the suit was pending. Finding that the court's reasons for release were outside the scope of permissible reasons under the governing statute, we set aside the order partially releasing the lis pendens as improper. That matter is not to be construed, as is now claimed by the plaintiff, to mean that the court had formed an adverse prejudgment of the case on its merits, but only that the court acted prematurely in releasing the lis pendens when it should have deferred consideration of such action until the disposition of the case. The plaintiff has failed to demonstrate that there is any substance to this claim.

There is no error.

In this opinion the other judges concurred.