[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The instant proceeding sounds in specific performance and/or money damages. It arose out of a contract[1] for the sale of a certain tract, piece or parcel of real estate devised to the plaintiff University and subsequently offered by it for sale. The contract here in issue was executed on or about December 5, 1986 and called for a closing date of "November 25, 1987, or at such other time or place as may be subsequently agreed upon in writing by the parties hereto. . . ." Time was not declared to be of the essence and the plain language utilized with respect to the closing CT Page 9142 date clearly manifests a recognition of the possibility of extension of the time of performance.
Of no minor significance was the introduction into the agreement of a sliding price scale which was intended to cause the purchase price to vary in proportion to the number of building lots approved by a local administrative agency or agencies. That language was set forth on the last page of the document under the designation of "SUCCESSION" and provided that:
 BUYERS shall use their best efforts to obtain town approvals for a subdivision of said property into nine (9) building lots and shall have one (1) year to obtain said approvals and close the purchase of the property.
 Provided that a minimum of five (5) lots are approved with respect to said subdivision, then BUYERS must complete the purchase of said property or forfeit the sum of $33,750.00 held in trust by SELLER'S attorney.
 In the event that nine (9) or more building lots are approved in said subdivision, then the purchase price will be $675,000.00 as stated herein. If fewer than nine (9) lots are approved then the purchase price would be adjusted as follows: $650,000.00 for eight (8) lots; $575,000.00 for seven (7) lots and $500,000.00 for six (6) or fewer lots.
 If the BUYER does not disclose for any reason then all engineering maps and related materials associated with the approval process will be delivered to the SELLER. SELLER shall pay BUYER for one-half the expenses incurred for said materials up to a maximum of $7,500.00, BUYERS to provide paid invoice documentation.
Several extensions were requested and granted.
The defendants duly applied to the Conservation Commission for approval of an eight (8) lot subdivision. This application was denied on February 10, 1988 and, CT Page 9143 subsequently, on July 27, 1988, an approval of a seven (7) lot subdivision was issued by that agency. With the successful accomplishment of obtaining the first approval firmly in hand, the defendants applied for the approval of that seven (7) lot subdivision from the Planning Zoning Commission. They described the Commission's reception of that application as hardly encouraging. On October 23, 1987, they received a communication from the subject agency with four "comments" indicating substantial dissatisfaction with that subdivision.
Four (4) of that communication is perhaps more significant than the others and appears to express, at least by inference, the thought of the Commission: "FINALLY, IT IS VERY DOUBTFUL THAT THIS PARCEL COULD BE DEVELOPED TO THE EXTENT PROPOSED." (Emphasis supplied.)
The defendants assert that at this time they were told informally by one or more members of the Commission that their plans to subdivide the tract into any number of building lots would not be successful. The impression clearly created that the Commission desired that the tract remain one large lot. Faced with the realization that any further applications would fail, they decided to forego any future submissions. Unfortunately for the defendants, the only evidence of these communications came from them individually. No other party who may have been privy to those communications was ever identified much less called to testify. Their vested interest in this litigation is patently obvious.
Thereafter, the exhibits[2] and all evidence disclosed substantial extensions and negotiations between the parties which might well suggest but do not rise to the level of an inference of abandonment of the original contract. On June 7, 1989, the defendants requested the return of their deposit and withdrew their application for a seven (7) lot subdivision. On July 13, 1989, the plaintiff demanded performance of the contract. On July 19, 1989, the defendants renewed their request to renegotiate. On July 29, 1989, the plaintiff demanded that the defendants perform the contract. Despite this demand, on September 28, 1989, the plaintiff's compromise offer was submitted and on December 28, 1989, the defendants responded wishing to again renegotiate. The plaintiff submitted an offer to compromise CT Page 9144 once more on March 21, 1990, and on March 22, 1990, the defendants rejected that latest offer to compromise. Finally, on March 22, 1990, the plaintiff demanded that the defendants perform the original contract. From the contractual date of closing, which was November 25, 1987, or "at such other time and place as may be subsequently agreed upon in writing between the parties . . ." until March 21, 1990, the date of the final and unequivocal demand, a period of TWO (2) YEARS AND FOUR (4) MONTHS ELAPSED. (Emphasis supplied.)
The plaintiff asserts that its remedy of specific performance is available and urges the court to require the defendants to apply for approval of a five (5) subdivision. It also claims that the mutual agreement on extensions maintain the life of the contract into July of 1989. It cites Ecos Corporation v. Conlon, 4 Conn. App. 572, and Three S. Development Co. v. Santore, 193 Conn. 174 as authority for its arguments. It declares that there was never any attempt to declare time to be of the essence and applies that principle to the occurrence of conditions and the performance of duties in accordance with Kakalik v. Bernardo. 184 Conn. 386.
The defendants have argued that the provisions of the contract in issue raises conditions, the nonfulfillment of which excuses performance. They cite Lach v. Cahill,138 Conn. 418. "`Whether the performance of a certain act by a party to a contract is a condition precedent to the duty of the other party to act depends on the intent of the parties as expressed in the contract and read in the light of the circumstances surrounding the execution of the instrument.'" Christophersen v. Blount, 216 Conn. 509, 512, 582 A.2d 460
(1990); Ravitch v. Stollman Poultry Farms, Inc., 165 Conn. 135,149, 328 A.2d 711 (1973); Lach v. Cahill, supra, 421, 81 A.2d 481 (1951). In searching for the intent of the parties as expressed in a contract, all relevant provisions of the contract must be considered together. Bialowans v. Minor,209 Conn. 212, 217, 550 A.2d 637 (1988). "`Where the language of the contract is clear and unambiguous, the contract is to be given effect according to its terms.' Barnard v. Barnard, 214 Conn. 99, 110, 570 A.2d 690 (1990)." F W Welding Service, Inc. v. ADL Contracting Corporation,217 Conn. 507, 517. CT Page 9145
The contract qua contract is clear and unambiguous throughout the first five (5) pages. However, with the exception of the first paragraph, the language appearing on page six (6) under "SUCCESSION" infringes upon that clarity and does in fact muddy the waters as it were. That first paragraph requires the defendants to "use their best efforts to obtain town approval for a subdivision of said property into nine (9) building lots, and shall have one (1) year to obtain . . . and close. . . ." The second recites that "[p]rovided that a minimum five (5) lots are approved . . . then BUYERS must complete the purchase . . . or forfeit the sum of $33,750.00. . . ."
The third provides for the sliding purchase price depending upon the number of lots approved. Finally, the fourth paragraph provides for a SELLER'S remedy on default. "[A]ll engineering, maps and related materials associated with the approval process will be delivered to the SELLER. SELLER will pay BUYER one-half the expenses incurred . . . up to . . . $7,500.00, to provide paid invoice documentation." The BUYERS expended additional funds in excess of twenty-one thousand three hundred ($21,300.00) dollars pursuant to their subdivision application.
The defendants never offered to purchase the subject property for the minimum purchase price set forth under the term "SUCCESSION" for five hundred thousand ($500,000.00) for six (6) or FEWER LOTS. (Emphasis supplied.) Therein perhaps lies one of the most relevant and significant facts to be found in this action. The passage of time, requests for extensions, offers to compromise, requests to renegotiate and the inartful language utilized in the agreement or any one of these considerations fail to establish that the provisions appearing under "SUCCESSION" twice discussed herein, rise to the level of establishing a condition precedent to the defendants' duty to act. The credible evidence heard by the court mandates that no such intent is manifested and no such finding is permitted. The efforts to raise the defense of impossibility casts little more than a mere shadow at best. The Planning Commission's comment about development to the extent proposed is exactly that. It applied to a seven (7) lot subdivision and no more. Interestingly enough, the document was dated October 23, 1987, and yet that application was not withdrawn until June 7, 1989. CT Page 9146
The court reiterates that no documentation or testimony from the supposed source, or information which would identify the speaker or speakers, or the date of said communication was offered in support of their premise, that such a communication was in fact uttered to them. This happening, if indeed it did occur, was never disclosed to the plaintiff until some nineteen (19) months thereafter. Once again, there is hardly credible evidence thereon to establish that defense nor to permit the court to find the defendants. exercised their "best efforts to obtain Town approval. . . ."
The counterclaim may might be well found to have been abandoned as once again credible evidence was conspicuous by its absence. Even assuming that the defendants believed it offered such evidence, the "full disclosure" pleaded is not approximated and certainly not proven. The reason alleged for extension is simply that — an allegation. Precious little of anything was attempted or accomplished after the Conservation Commission's approval on July 27, 1988, save the withdrawal of the application before the Planning Commission on June 7, 1989. In sum, this action hardly establishes that the extensions beyond the "contract date" were used for additional development purposes; and were unable to be accomplished. . . ." At the risk again of redundance, there is no credible evidence to lend support to or establish the allegations of counterclaim.
Judgment may enter for the plaintiff on its complaint and for the plaintiff on the defendants' counterclaim. A decree of specific performance may enter mandating that the defendants perform the contract by making application to the Newtown Planning Zoning Commission for a subdivision of six (6) lots or fewer in accordance with the terms of the contract. That ultimate purchase price is subject to thirty-three thousand seven hundred fifty ($33,750.00) dollars previously paid on the execution of the contract.
Moraghan, J.