[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This matter came before the court on applications by both the plaintiff and defendants for injunctive relief. It was tried on multiple days concluding July 25, 2002. Thereafter, the parties submitted trial briefs which were filed with the court on September 4 and 11, 2002. The parties were, at their request, referred for court mediation which was reported unsuccessful on October 24, 2002.
The plaintiff, Cost Management Incentives, Inc. (Cost Management) does business in Connecticut. Its business is the placement of employees in the pharmaceutical industry. The defendants, Yollanda London-Osborne and Kristen Herman were both employed at Cost Management. The controversies before the court arise out of that employment relationship. Both London-Osborne and Herman were terminated from their respective employment with the plaintiff
The principals of the plaintiff corporation are David Hallen, who has been the president and chief executive officer of the plaintiff for over ten years, and Alan Gold, who is the vice president of the plaintiff corporation.
At issue for each of the defendants are restrictive covenants, executed in May, 1996.
At the time the covenants (which are covenants not to compete) were presented to each of the defendants, they were, and had been in the employ of the plaintiff for numerous years. Neither was offered anything in addition to their present salary and benefits to sign the covenant. Gold hovered over London-Osborne as London-Osborne signed the covenant. London-Osborne noted if she shouldn't take the agreement to her attorney; she believed she would lose her job if she did not sign it. As Gold was on his way from her office to Herman, London-Osborne telephonically "buzzed" Herman and informed her of the conversation regarding the covenant Gold was now bringing to Herman for signature. Herman had no reason to believe CT Page 15561 her situation was different. When she inquired of Gold, he told her she needed to sign the covenant, that it was "not a big deal" and that it was something to protect him and Hallen. He told her to sign it, left the office and returned five minutes later to retrieve it.
Upon her review of the document in the five minutes, Herman was generally aware that she would not be able to do the same work with another employer, but was not cognizant of anything beyond that.
At the time that Herman signed the agreement she was earning approximately $24,000 a year, at the rate of $300 per week and $500 for each job placement she completed. London-Osborne was earning about $80,000 at the time she signed the agreement in 1996.
Neither London-Osborne nor Herman received anything in exchange for executing their respective noncompete agreements. That is neither received any benefit to their employment by way of income, salary, bonus, fringe benefits or promotion for executing the agreements. They each continued in their employment until they were terminated.
It is those agreements that the plaintiff, Cost Management seek to enforce here.
The defendants claim they are unenforceable because 1) they lack consideration, and 2) the conduct of the plaintiff has been so offensive that the agreements should not be enforced. Further, the defendants assert that neither of them have breached the agreements, through the date of the hearing.
The defendants each have been subjected to sexual harassment and the conditions which constitute a hostile work environment, by Gold and Hallen, the principals of plaintiff corporation.
After observing the demeanor and history to the testimony of the parties the court finds that Gold has, during Herman's employment, sexually harassed her. He has touched her on her leg at the thigh, he has placed his tongue in her ear and he has placed his hands on her neck as if to massage it. Herman's response has been to move away from Gold when he has done these things. These events have all occurred since Herman signed the noncompete agreement.
London-Osborne commenced employment with the plaintiff in December, 1993, as a recruiter. Her duties were to make calls throughout the nation seeking to garner a pool of candidates for pharmaceutical industry employment positions. During the time of her employment over the years, CT Page 15562 she acquired increased responsibilities, and, her compensation substantially increased over time. At the time of her hire, she earned about $25,000 the first year. At the time of her termination, she was earning in the $140,000-150,000 range.
During the tenure of London-Osborne's employment with Cost Management she repeatedly experienced obnoxious and demeaning behavior from the plaintiff's principals. After signing the agreement in May, 1996 Gold would stroke her arm or thigh and make sexual comments. It occurred two to three times a month in the office. She would move away from him but he would do it again on another occasion. Gold also in 1998 suggested she have sex with him and otherwise subjected her to sexual references in conversation. He also degraded her racially on repeated occasions. Hallen never touched her but would periodically make sexual and sexist comments in her presence. She felt all of this was an attack on her. London-Osborne showed a tough exterior to Hallen and would sometimes retort to him, with obscenities. She remained at her employment because she enjoyed the work, responsibilities and independence she had at her work; she needed the income and had no alternate job to go to. She was also aware she was subject to the noncompete agreement at issue here once it was signed.
London-Osborne was terminated on December 4, 2001. At the time of her termination, she was Director of Operations at the plaintiff's business. She had been employed by the plaintiff for eight years prior to her termination. She was terminated on a Monday after a dispute that had occurred between her and Hallen on the previous Friday. The dispute centered around several issues, including her lack of desire to attend a management meeting on Friday. They both raised their voices and used obscenities at the Friday session. On Monday, when he verbally confronted her about her behavior, she went to leave and was told that she was fired if she left the building; she did and she was terminated.
Kristen Herman commenced work at Cost Management in May, 1995, as a recruiter. On December 25, 2001, she took maternity leave for two months and thereafter returned to work part-time at twenty hours per week. On April 10, 2002 she was terminated from her job. At the time of her termination, she was Associate Director of Sales and Marketing.
Somewhere in the 1998-99 time frame, the president, Hallen, asked Herman to purchase him narcotics. When she put him off he repeatedly requested until she felt intimidated into providing him something. She gave him a bag of herbs, hoping he would leave her alone after that.
Over the time of Herman's employment Hallen would make inappropriate CT Page 15563 sexual comments about her, telling Herman he had only hired her for her big breasts, not her brains. An e-mail attributable to Hallen disclosed to third parties inappropriately and untruthfully that Herman was being treated for venereal disease. He also inferred that she closed a deal at work by having sex with the clients. These comments were all made in the late 1998-2000 time frame.
Herman had no where in the chain of command to go about these problems with Hallen. She told London-Osborne, her immediate supervisor, but London-Osborne was equally powerless to handle the problem, since Hallen is the president of the company.
Herman had been on maternity leave for two months from Christmas, 2001 and then at the end of February she came back to work part time, at twenty hours per week. London-Osborne had been terminated shortly before the commencement of her maternity leave. Her job title at the time she left on leave was Associate Director of Sales and Marketing. When she returned from leave she found clients she had worked with had been permanently redistributed to other employees in her absence. She complained of this because she felt her income would significantly decrease as a result.
On April 10, 2002 when Herman was terminated from her employment with the plaintiff, Gold stated that her reason for termination was because she was dissatisfied with her position and her performance was sub par since she came back from a maternity leave.
Herman believes she was terminated because she was supporting London-Osborne in a complaint against the plaintiff before CHRO. Hallen called her in his office on April 10, 2002 and Gold who was sitting on a couch, greeted her as "Babe." Hallen told her she was being terminated because he believed her to be unhappy there. She did not agree with this and she pointed out that she had never been disciplined. Notwithstanding this, Herman was terminated at that time.
Within two days of Herman's termination she was served with the summons and complaint in this matter.
From date of service to the present time, neither Herman nor London-Osborne have violated the term of the noncompete agreement. There is no conduct of theirs alleged to be in violation. Plaintiff seeks a prophylactive order barring either of them from violating the agreement. Each defendant seeks an order declaring the agreement unenforceable as to her. The noncompete agreement contains a one year noncompete provision and a two year nonsolicitation provision. Thus, the agreements contain both an antisales covenant and an antisolicitation covenant.[1]
CT Page 15564
"It is basic that a covenant restricting the covenantor from engaging in a competing enterprise is one in restraint of trade and therefore is against public policy if the restraint is unreasonable. It is not valid unless it is ancillary either to a contract for the transfer of good will or other subject of property or to an existing employment or contract of employment. Restatement, 2 Contracts 515(e); 17 C.J.S. 629." Domurat
v. Mazzaccoli, 138 Conn. 327, 330, 84 A.2d 271 (1951).
"In order to be valid and binding, a covenant which restricts the activities of an employee following the termination of his employment must be partial and restricted in its operation "in respect either to time or place, . . . and must be reasonable — that is, it should afford only a fair protection to the interest of the party in whose favor it is made and must not be so large in its operation as to interfere with the interests of the public. Cook v. Johnson, 47 Conn. 175, 176; May v. Young, 125 Conn. 1, 5, 2 A.2d 385; Samuel Stores, Inc. v. Abrams,94 Conn. 248, 253, 108 A. 541, 9 A.L.R. 1450." Torrington Creamery, Inc.v. Davenport, 126 Conn. 515, 519-20, 12 A.2d 780; see Oregon SteamNavigation Co. v. Winsor, 87 U.S. (20 Wall.) 64, 66-67. The interests of the employee himself must also be protected, and a restrictive covenant is unenforceable if by its terms the employee is precluded from pursuing his occupation and thus prevented from supporting himself and his family. See May v. Young, supra." Scott v. General Iron WeldingCo., 171 Conn. 132, 137, 368 A.2d 111 (1976).
 I. Reasonableness of the Covenants
"A covenant that restricts the activities of an employee following the termination of his employment is valid and enforceable if the restraint is reasonable. Scott v. General Iron Welding Co., supra, 137. There are five criteria by which the reasonableness of a restrictive covenant must be evaluated: (1) the length of time the restriction is to be in effect; (2) the geographic area covered by the restriction; (3) the degree of protection afforded to the party in whose favor the covenant is made; (4) the restrictions on the employee's ability to pursue his occupation; and (5) the extent of interference with the public's interests. Id., 137-38. The five prong test of Scott is disjunctive, rather than conjunctive; a finding of unreasonableness in any one of the criteria is enough to render the covenant unenforceable. New HavenTobacco Co. v. Perrelli, supra 639, n. 2." New Haven Tobacco Co. v.Perrelli, 18 Conn. App. 531-2, 559 A.2d 715 (1989).
A further description of the nature of the plaintiff's business is necessary for a proper disposition of this issue. The business of the CT Page 15565 plaintiff is the recruitment of potential employees and employers for placement of the employees in positions in the biotechnology and medical clinical research area and pharmaceutical industry. The vast majority of the work performed is for temporary placements, although the plaintiff also is involved in permanent replacements. The candidates for employment are retained in a database at the plaintiff's office. The candidates for employment came from all over the country. That database and the database of employment placements was not password protected from 1996-2001. Most of the plaintiff's business involved placement with six employers: Pfizer, Abbott, Schering-Plough, Hoffman LaRoche, Astrozenica [sic?] and Novardis. These six employers accounted for 70-75% of the business of the plaintiff.
The covenants at issue, in salient part, state:
 "1. Noncompetition Agreement. During the term of his/her employment with CMI, and for a period of one (1) year thereafter (the "Noncompetition Period"), Employee shall not, without the express written consent of CMI, directly or indirectly acquire, manage, operate, join, control or participate, or become interested in or connected with, as a partner, director, consultant, agent or otherwise, any corporation, firm, business, partnership or other organization which is engaged, anywhere in the United States, in (i) the Business, as hereinafter defined, or any aspect thereof, or (ii) any other business which, in any manner, directly or indirectly competes with the business of CMI as of the date of the termination of Employee's employment. Notwithstanding the foregoing, Employee may acquire or hold, for investment purposes only, up to 1% of the outstanding equity securities of any publicly-traded company.
 For the purpose of this Agreement, the term "Business" shall mean the business of making temporary placements (including contract placements) and/or permanent placements in the pharmaceutical industry and/or any other industry serviced by CMI during the one year period prior to the termination of Employee's employment.
 Employee shall give CMI advance written notice of any employment or other business activities which he/she proposes to engage in during the Noncompetition Period CT Page 15566 which might reasonably be construed to be within the scope of Employee's obligation not to compete under this Agreement, which notice shall describe, in detail reasonably satisfactory to CMI, the activity to be undertaken by Employee and the nature of the business of the entity with which such activity is to be undertaken.
 2. Nonsolicitation Agreement. For so long as Employee is employed by CMI, and for a period of two (2) years thereafter (the "Nonsolicitation Period"), Employee shall not, directly or indirectly, for himself/herself or for, or on behalf of, any person, firm, corporation, business, partnership or other organization other than CMI, (i) induce any employee of CMI to leave the employ of CMI, or (ii) without the prior consent of CMI, solicit the business of any person or entity that is a customer or client of CMI on the date of the termination of Employee's employment, or was a customer or client of CMI during the twelve (12) month period immediately preceding such termination."
(a) Length of time and geographic restriction to be in effect
The antisales covenant is for one year and the ant-solicitation covennant is for two years, from termination, for both defendants. The territory sought to be protected by these provisions is the entire nation of the United States. The court finds the geographic scope to be reasonable for noncompetition in light of the fact that the plaintiffs employment candidates come from all over the nation. However to have a nationwide prohibition on solicitation of business for placement from employers is overly broad in light of the fact that 70-75% of the plaintiff's business comes from only six companies, albeit giants in their industry. The plaintiff drafted the language of the covenant. It could have easily been tailored more narrowly to protect the legitimate business concerns of the plaintiff without extending an industry wide restriction where such a small part of the plaintiff's business is otherwise occupied by the many biotech, pharmaceutical and medical firms in the clinical research field. CT Page 15567
The court further finds that the anti solicitation covenant of two years is overreaching. The purpose of a geographic and time limited restrictive covenant is to provide plaintiff with the protection it needs while it moves to protect its position in the marketplace it competes in. In light of the fast moving nature of the biotechnology market, as described in testimony, two years is not necessary for the plaintiff to secure its position to withstand competition from the defendants.
(3) Degrees of Protection
The plaintiff seeks protection as to the placement of both temporary and permanent employees since each is a composite part of the business. The relationships that the defendants have established with candidates is largely in the area of temporary placements. Neither defendant has a copy of the database of these candidates. It took plaintiff years to establish the pool of candidates in its database. The names were called from directories that are available to anyone; they are not especially segregated or password protected.
The covenant's language is so overly broad it provides more protection than plaintiff needs, especially in light of its comprehensive ban on defendants' employment in making placements "in the pharmaceutical industry and/or any other industry serviced by Cost Management."
The court finds the language of the industry sought to be protected as unnecessarily overreaching and broad. While in testimony plaintiff sought to limit this to the biotechnology market, the covenant itself is overly broad. Further the plaintiff has had the benefit of this overly broad covenant from each of the defendants' terminations to the date of this decision. This is unequitable and unfair.
(4) Restrictions on Ability of Employee to Pursue Her Occupation.
Both defendants have sought employment since their termination from the plaintiff's employment. Each has looked for work that would not violate the scope of the CT Page 15568 restrictive covenant. Neither has been successful in gaining employment. London-Osborne has sought employment through Yale, the yellow pages, business development companies, the internet and area pharmaceutical companies. Her work has been in business development, sales and marketing with plaintiff. She remains unemployed.
London-Osborne has a desire to work in the pharmaceutical employment placement industry. The covenant's language is so overly-broad she has been prevented from seeking employment in this much larger market because, not until the dates of the testimony, did they find plaintiff sought to restrict the defendants only in pharmaceutical biotechnology. The court finds the defendants have been unduly restricted from attaining employment because of the overly broad language of the covenants.
(5) Extent of Interference with the Public Interest
The plaintiff's is a niche market. While the public has an interest in competition, the plaintiff has not created a monopoly by virtue of these covenants. The public's interests are not affected in any significant way.
 II. Ancillary to Employment Contract
The defendants also argue that the restrictive covenants should not be enforced by the court because they lack sufficient consideration, an essential element for the formation of the agreement. The court goes on to consider this agreement as well, though the court has found the covenant's overly broad and thus, unenforceable.
"A covenant restricting the activities of an employee after the termination of his employment in order to be valid and enforceable must be partial or restrictive in its operation in respect either to time or place, must be on some good consideration, and must be reasonable that is, it should afford only a fair protection to the interest of the party in whose favor it is made and must not be so large in its operation as to interfere with CT Page 15569 the interests of the public. Cook v. Johnson, 47 Conn. 175,176; May v. Young, 125 Conn. 1, 5, 2 A.2d 385; SamuelStores, Inc. v. Abrams, 94 Conn. 248, 253, 108 A. 541,9 A.L.R. 1450." Torrington Creamery, Inc. v. Davenport,126 Conn. 515, 519-20, 12 A.2d 780 (1940).
"It is well settled law in Connecticut that continued employment is not consideration for a covenant not to compete entered into after the beginning of the employment. The case cited by the defendant, Van DyckPrinting Co. v. DiNicola, 43 Conn. Sup. 191 (1993) is not applicable to the case at bar. In Van Dyck the parties had not concluded the terms of the employment contract. However, wording in Van Dyck is instructive in that it says: "This case does not resemble the situation presented in National Safe Northeast, Inc. v. Smith, Superior Court, Superior Court Judicial District of Hartford-New Britain at Hartford, Docket No. 304189 (December 31, 1985), in which an employee who had been working for one year was asked to sign a covenant not to compete as a condition of continued employment, a circumstance found to entail no new consideration for the new obligation. Also see Dick v. Dick, 167 Conn. 210
(1974), which held that continued employment is not additional consideration and that past consideration cannot support the imposition of a new obligation. Also see Kristin Norton v. Commercial Credit Corporation, etal, CV 98-0578441, Superior Court Judicial District of Hartford at Hartford, October 6, 1998 (Rittenband, J.) citing Thermoglaze, Inc. v. Morning Side Gardens Co.,23 Conn. App. 741, 745, 583 A.2d 1331 (1991) andTorosyan v. Boehringr Ingelheim Pharmaceuticals, Inc.,234 Conn. 1, 18, 662 A.2d 89 (1995)." Artman v. OutputTechnologies Sol. E.R., No. CV 00-0595362-5 (Jun. 28, 2000) 2000 Ct. Sup. 8003, ___ CLR ___, 373.
While the weight of the authority lies with this interpretation of the law, invalidating restrictive covenants which offer no more consideration than the continued employment as an at will employee, there is also authority to the contrary. "The underlying purpose of the defendant in entering into the agreement was to continue thereafter in the employment of the plaintiff at a mutually agreeable salary; the benefit offered him was such a continuance, in return for which the CT Page 15570 plaintiff was to receive his services and the benefit of the restrictive covenant in the agreement. The defendant received the benefit he sought in that he was continued in the employment more than four years after the agreement was made, until he voluntarily left it. In such a situation, what is said in Willetts v. Sun MutualIns. Co., 45 N.Y. 45, 47, is applicable: "Though there be not mutual promises, yet if, before he calls for the fulfillment of the promise, the promisee do perform that, in consideration of his doing which the promise is made, there is a consideration for the agreement, and it can be enforced." See Wisconsin Ice Coal Co. v.Lueth, 213 Wis. 42, 250 N.W. 819; Raymond v. White,119 Mich. 438, 78 N.W. 469. The plaintiff, having paid the defendant a weekly salary satisfactory to him, from the time when the agreement was made, and having continued the defendant in his employment until he voluntarily left, has given to the defendant the benefit for which he bargained, and has, by performance, made certain that which before was uncertain; the restrictive covenant is in itself sufficiently definite; and after the withdrawal of the defendant from the plaintiff's employment, it was founded upon an adequate consideration given. Roessler v. Burwell, 119 Conn. 289,293-4, 176 A. 126 (1934). This holding has been extended in similar situations by several trial courts. cf When a "preexisting contract of employment is terminable at will, [n]o overt consideration is required to support an otherwise valid covenant not to compete." Daniel v.Keane Agency, Inc. v. Butterworth, Superior Court, judicial district of New Haven, Docket No. 3131 81 (February 22, 1995, Levin, J.); R C Livolsi, Inc.,v. Campanelli, No. CV97-0259 105S (Oct. 8, 1997)1997 Ct. Sup. 10254, ___ CLR ___, Page 10205 (Dorsey, J.T.R.); Welles v. O'Connell, 23 Conn. Sup. 335,183 A.2d 287 (1962).
These cases are distinguishable, however. Here, neither of the defendants voluntarily left their employment. Each was terminated. Therefore, it is the plaintiff itself which has broken the bargain, or, withdrawn the consideration it cites for the agreements. The court notes further that the Van Dyck
trial court decision (Hodgson, J.) took pains to distinguish the factual situation there from one where CT Page 15571 there was no new consideration for the restrictive covenant. Van Dyck was affirmed by the Connecticut Supreme Court in its entirety. 231 Conn. 272, 648 A.2d 877
(1994). Finally, here, the defendants each were not provided a sufficient opportunity to consult counsel, or to make an intelligent and informed decision as to whether to sign the agreements. Accordingly, the court finds that the agreements are unenforceable for they lack adequate consideration and were signed by the defendants under coercive circumstances.
 III. Breach of Contract Requires Denial of Enforcement
The defendants also argue that the offensive conduct by the principals of the plaintiff constitute a material breach of the employment contract which should result in an order of the court declining to enforce the restrictive covenants between the plaintiff and the defendants. The breach of contract claim was made orally at the commencement of trial when it became clear that, although the parties had agreed to try the temporary and permanent injunction claims together, the pleadings had not yet been closed. The plaintiff has interposed a claim of laches and a claim of failure to exhaust administrative remedies in defense of the defendants' claim of breach of contract. They are addressed seriatum.
"Only where a party seeking to enforce a contract is in material breach will that party be denied enforcement of the contract. Bernstein v. Nemeyer, 213 Conn. 665,666-67, 570 A.2d 164 (1990); Ravitch v. Stoilman PoultryFarms, Inc., 165 Conn. 135, 147, 328 A.2d 711 (1973);Silliman Co. v. Ippolito Sons, Inc., 1 Conn. App. 72,75, 467 A.2d 679 (1983), cert. denied, 192 Conn. 801,470 A.2d 1218 (1984)." Van Dyck Printing Co. v.DiNicola, 43 Conn. Sup. 191, 199, 648 A.2d 898, aff'd231 Conn. 272, 648 A.2d 877 (1994). The breach of contract claims which is based on a hostile work environment is found proven by the court. The hostile work environment found by the court, violates the covenant of implicit in every at will employment agreement. CT Page 15572
 A. Laches
The plaintiff argues that the doctrine of laches should apply here in that neither of the defendants challenged the agreements until the plaintiff sought to enforce their contents as against the defendants. The court disagrees. The conduct of the plaintiff's principals is the breach of contract that excuses enforcement of the contract as a matter of public policy. Laches cannot be found to apply when the plaintiff's conduct is at fault and the defendants sought only to stay in their respective employment, free of hostility. Neither defendant quit, they were each terminated.
"The equitable doctrine of laches is an affirmative defense that serves as a bar to a claim for equitable relief where a party's delay in bringing suit was (1) unreasonable, and (2) resulted in prejudice to the opposing party." Unified School Dist. No. 1 v.Connecticut Department of Education, 64 Conn. App. 272,284 (2001). Laches is an equitable defense. If plaintiff had clean hands in dealing with the defendants — if its workplace were not hostile — perhaps, then, defendants would be precluded in asserting their position. Their delay of five years, respectively, then would have been considered in light of them enjoying the fruits of their employment agreements. These agreements were breached by plaintiff, both in terminating each plaintiff where the covenant's asserted consideration was continued employment, and, in the maintenance over the five years of an unfriendly and hostile workplace. This defense cannot stand.
 B. Failure to Exhaust Administrative Remedies
"It is a settled principle of administrative law that if an adequate administrative remedy exists, it must be exhausted before the Superior Court will obtain jurisdiction to act in the matter." (Internal quotation marks omitted.) Fish Unlimited v. Northeast UtilitiesService Co., 254 Conn. 1, 11-12, 756 A.2d 262 (2000). "The [exhaustion] doctrine is applied in a number of different situations and is, like most judicial doctrines, subject to numerous exceptions . . . [W]e CT Page 15573 have recognized such exceptions only infrequently and only for narrowly defined purposes . . . such as when recourse to the administrative remedy would be futile or inadequate. In light of the policy behind the exhaustion doctrine, these exceptions are narrowly construed." (Citations omitted; internal quotation marks omitted.) Id., 11-13.
"The CHRO has no authority to award compensatory and punitive damages. Bridgeport Hospital v. Commission onHuman Rights and Opportunities, 232 Conn. 91, 102, 111,653 A.2d 782 (1995). There is currently a split in Superior Court as to whether a plaintiff must exhaust administrative remedies when she seeks relief that the CHRO does not have the authority to award. . . .
"Even those cases which hold that a plaintiff must exhaust her administrative remedies with the CHRO apply this reasoning only to statutory claims. See, e.g., Okunv. Misiewicz, supra, Superior Court, Docket No. 67084 (applying the exhaustion doctrine to count one only, which alleged a violation of § 46a-60); Matejek v.New England Technical Institute of Connecticut, Inc., supra, Superior Court, Docket No. 404320 (expressly stating that the second count, alleging intentional infliction of emotional distress, was not at issue in consideration of the motion to dismiss); Brightly v.Abbott Terrace Health Center, supra,29 Conn.L.Rptr. 102 (treating the plaintiffs common law counts, alleging wrongful termination, intentional infliction of emotional distress and breach of the implied covenant of good faith and fair dealing separately from the plaintiffs statutory count, alleging a violation of § 46a-60)." Giantis v.American Mortgage Services, No. CV-00-0092711 S (Apr. 24, 2002) 2002 Ct. Sup. 5521-br-bt,32 CLR 98.
The remedy sought by the defendants in their counterclaim, namely a declaratory judgment that the agreements are not enforceable as to them is not a remedy available to them through CHRO. Accordingly, the doctrine of exhaustion of administrative remedies does not lie here. CT Page 15574
 III. Unclean Hands Requires Denial of Enforcement
The defendants also as a matter of defense to this claim by the plaintiff for equitable relief, namely an injunction, assert that the plaintiff's claim should be denied because it has unclean hands. The unclean hands, defendants assert, is the conduct of the principals in their derogatory racial comments to London-Osborne, the solicitation of drugs of Herman and the sexual harassment verbally and physically to both of them by both principals.
"It is a fundamental principle of equity jurisprudence that for a complainant to show that he is entitled to the benefit of equity he must establish that he comes into court with clean hands. . . . The clean hands doctrine is applied not for the protection of the parties but for the protection of the court. . . . It is applied not by way of punishment but on considerations that make for the advancement of right and justice." (Internal quotation marks omitted.) Eldridge v.Eldridge, 244 Conn. 523, 536, 710 A.2d 757 (1998). "The doctrine of unclean hands expresses the principle that where a plaintiff seeks equitable relief, he must show that his conduct has been fair, equitable and honest as to the particular controversy in issue. . . . Unless the plaintiff's conduct is of such a character as to be condemned and pronounced wrongful by honest and fair-minded people, the doctrine of unclean hands does not apply." (Citation omitted.) Bauer v. WasteManagement of Connecticut, Inc., 239 Conn. 515, 525,686 A.2d 481 (1996).
Because the doctrine of unclean hands exists to safeguard the integrity of the court; Eldridge v.Eldridge, supra, 244 Conn. 536; Pappas v. Pappas,164 Conn. 242, 246, 320 A.2d 809 (1973); "[[w]here a plaintiff's claim grows out of or depends upon or is inseparably connected with his own prior fraud, a court of equity will, in general, deny him any relief, and will leave him to whatever remedies and defenses at law he may have." (Internal quotation marks omitted.)Samasko v. Davis, 135 Conn. 377, 383, 64 A.2d 682
(1949). The doctrine generally "applies [only] to the CT Page 15575 particular transaction under consideration, for the court will not go outside the case for the purpose of examining the conduct of the complainant in other matters or questioning his general character for fair dealing. The wrong must . . . be in regard to the matter in litigation. . . . Though an obligation be indirectly connected with an illegal transaction, it will not thereby be barred from enforcement, if the plaintiff does not require the aid of the illegal transaction to make out his case." (Citation omitted; internal quotation marks omitted.) Id.; see also Keystone DrillerCo. v. General Excavator Co., 290 U.S. 240, 245,54 S.Ct. 146, 78 L.Ed. 1045 (1933) (courts "do not close their doors because of [a] plaintiff's misconduct, whatever its character, that has no relation to anything involved in the suit, but only for such violations of conscience as in some measure affect the equitable relations between the parties in respect of something brought before the court for adjudication"); Orsi v.Orsi, 125 Conn. 66, 70, 3 A.2d 306 (1938) (clean hands doctrine prevents "a party from asserting in court a title where, in order to do so, he must rely upon a transaction tainted with illegality or inequity"). In addition, the conduct alleged to be unclean must have been done directly against the interests of the party seeking to invoke the doctrine, rather than the interests of a third party. Orsi v. Orsi, supra, 69-70 ("[t]he wrong must be done to the defendant himself and must be in regard to the matter in litigation" [internal quotation marks omitted])." Thompson v. Orcutt,257 Conn. 301, 309-311, 777 A.2d 670 (2001).
Essentially the doctrine as applied here would require the court to consider whether the conduct of Hallen and Gold was so offensive as to constitute a hostile workplace. The court finds that it was.
To establish a claim of hostile work environment, "the workplace [must be] permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment. . . . Harris v. Forklift Systems, Inc.,510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295
(1993). . . ." (Internal quotation marks omitted.) CT Page 15576Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75,78, 118 S.Ct. 998, 1001, 140 L.Ed.2d 201 (1998). "[I]n order to be actionable . . . a sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so. . . . [W]hether an environment is sufficiently hostile or abusive [is determined] by looking at all the circumstances. . . ." (Citations omitted; internal quotation marks omitted.) Faragher v.Boca Raton, 524 U.S. 775, 787, 118 S.Ct. 2275, 2283,141 L.Ed.2d 662 (1998)." Brittell v. Department ofCorrection, 247 Conn. 148, 166-7, 717 A.2d 1254 (1998).
The conduct at issue here is not a single, isolated incident of sexual harassment of either of the defendants. The record of this trial is replete with repeated abusive and gross conduct by the principals of the plaintiff in their treatment of the defendants orally, physically and in email writings. These abusive behaviors toward each defendant reinforced and reverberated for both of them, especially in light of London-Osborne being Herman's immediate supervisor.
 Conclusion
The restrictive covenants are unenforceable for more than one reason: they are overly broad as to geography and time and they present undue restriction on the defendants' ability to pursue their respective occupation. The court also finds, under the circumstances of this case, the agreement lacked consideration for the promise of continued employment and no termination was voided when each defendant was terminated. Further since the plaintiff materially breached its agreement with each defendant, the court declines to enforce the agreements as to each. The plaintiff has not proven its special defenses of laches or failure to exhaust administrative remedies.
In light of these findings and conclusions the court denies the plaintiff's claims for relief and grants defendants' request for a declaratory judgment and declares the court finds the restrictive covenant agreements by and between the plaintiff and the CT Page 15577 defendant are unenforceable and void.
 Motion for Sanctions
After review of all argument and documentation, the plaintiff's motion for sanctions is denied.
MUNRO, J.