[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The above-captioned case concerning payment of municipal sewer charges came before this court for trial on the merits on February 19, 20, 21, 25, 26 and 27, 1997.
Procedural History
The history of the case requires some mention. The complaint was commenced by the plaintiff City of New Haven Water Pollution Control Authority ("WPCA") on July 18, 1991. After the suit was filed, disagreements between the WPCA and Hamden escalated, creating new issues as to subsequent years. When the pleadings grew to six subfiles in three accordion files and the issues were still not joined, with protracted ongoing discovery disputes, the presiding courtside judge specially assigned the case to the undersigned to hear all motions and issue trial management orders to get the case ready for trial. The parties consented to this assignment. Because the claims, defenses and counterclaims had CT Page 4171 become voluminous and difficult to track through a long history of amendments and revised pleadings, with some abandoned issues still appearing in the pleadings, on October 24, 1996 this court ordered the parties to compile lists of the issues that would actually be pursued at trial, along with the dollar amount claimed as to each issue and a summary of the basis in the evidence for each claim and its calculation. This trial management order provided that the parties exchange responses to each claim stated by the other and then file with the court a joint list of disputed issues remaining after this process, with trial scheduled for February 19, 1997.
The parties complied with the above order and submitted a joint statement of the issues to be decided at trial. The WPCA listed claims of nonpayment or underpayment of sewer charges for several years between fiscal year 1985-86 and fiscal year 1995-96 along with eleven issues concerning disputed charges that it claimed were due in addition to the underpayments.
The defendant Town of Hamden ("Hamden") denied that it had paid less than was due the WPCA and listed 109 issues involving claims of errors in calculating its bills from fiscal year 1983-84 through fiscal year 1995-96.
In addition to the enumerated issues concerning the billing for each fiscal year, the parties submitted a list of seventeen questions identifying issues to be decided. The parties moved at the conclusion of the evidence to amend their pleadings to conform to the proof and to the issues as stated in their Joint List of Disputed Issues which was designated Exhibit 13. The parties requested that this court both write a memorandum of decision and record its decision as to each of the 120 issues on Exhibit 13. The seventeen legal issues listed in the Joint List of Disputed Issues are covered in this ruling. Adjudication of the 120 additional issues has been further recorded on a copy of Exhibit 13, which is incorporated into this opinion. As to claims for interest on unpaid amounts, the parties stipulated to the use of jointly submitted interest rates for various years. Any issues set forth in the pleadings but not preserved in the Joint List of Disputed Issues are deemed abandoned, pursuant to the court's pretrial management order to list all issues that were being pursued.
Jury Claim
CT Page 4172
After this case had been pending for over five years, Hamden filed a claim for trial by jury, claiming that an amendment to the pleadings made the claim timely. On February 22, 1996, the court, Thompson, J., struck the jury claim. On January 20, 1997, during compliance with this court's trial management order that included an order scheduling the trial for February 19, 1997, Hamden filed another claim for a jury trial. This court found that there had not been such an alteration of the pleadings or the issues that Hamden was entitled to a new election as to whether the case should be tried by a jury, applying the principles and standards with regard to amendments that are stated in Masto v. Board of Education, 200 Conn. 482, 488 (1986);Atta v. Cutner, 95 Conn. 576, 577 (1920); and Flint v. NationalRailroad Passenger Corp., 37 Conn. App. 162, 165 (1995).
While the defendant claims that it raised a new issue by asserting that the plaintiff had concealed the existence of a cause of action and that the statute of limitations should therefore be tolled, prior versions of the defendant's pleadings had raised the issue of nondisclosure of billing practices through the audit process used.
Stipulations
The parties have stipulated that the figures set forth in the Joint List of Disputed Issues are accurate, such that neither party contests the amount of the claim of the other, but only the validity of the claim itself. As to each fiscal year, the parties have set forth a figure identified as "Basis of the Billing Before Claims." That amount does not necessarily match the actual bills, which were complicated by periods of nonpayment, charges for late payment, and other issues which have been presented as separate claims for this court to decide.
The parties have also stipulated as to the amounts paid by Hamden as to each fiscal year. Similarly, these figures may not correspond to checks or other evidence of payment because of late payments and disputed allocations while this suit was pending. The parties have stipulated that the "Basis of the Billing Before Claims" figures in Exhibit 13 do not include those charges that are among the WPCA's eleven claims, so that a finding in favor of the WPCA as to any of those claims would not result in a double inclusion of a charge. The parties have further stipulated that the Basis of the Billing figure would be reduced by a finding in favor of Hamden as to any of its claims for the fiscal year at CT Page 4173 issue.
General Findings
In 1957 the City of New Haven and the town of Hamden entered into an agreement by which the City agreed to process waste water generated in Hamden at New Haven's waste water treatment plant. Pursuant to a plan for regional facilities for processing sewage and other wastes that included an upgrading of water treatment facilities to comply with the Federal Water Pollution Control Act Amendments of 1972, the relationship was restructured in a new agreement entered into on June 28, 1984 between the WPCA and Hamden. By the terms of that agreement, the WPCA agreed to terminate the prior sewer agreement but to continue to accept sewage and waste water generated in Hamden and to process and dispose of it through its interceptor sewer system and waste water treatment facilities. In return, Hamden agreed to pay for the services received according to contractual provisions, based on the proportion of its waste to the total of wastes being received, treated and processed by the WPCA.
The WPCA also entered into contracts with Woodbridge and with East Haven, which was also a feeder town for sewage from parts of North Branford.
In addition to processing wastes from these towns, the WPCA operated the local waste water disposal network of sewers in the City of New Haven and processed the flow from these local New Haven sewers at its treatment plant on the East Shore. The clear intent of the 1984 agreement between Hamden and the WPCA was that in return for being relieved of the need to build, maintain and operate its own waste water treatment plant, Hamden would pay the WPCA for these services. The agreement did not obligate the WPCA to perform any services concerning local sewers within the town of Hamden. Hamden was in essence a "wholesale" customer of the WPCA, and it billed its own retail customers who used its local sewer system and benefited from the WPCA's agreement to process those wastes. The residents of New Haven were the WPCA's retail customers and were billed by the WPCA.
The 1984 agreement, Exhibit 3 at trial, sets forth in Article 5 the basis for calculating Hamden's annual bill and the system for billing Hamden. That contract provides that Hamden is to pay annually its proportional share, based on its flow rate, of 1) capital cost charges and 2) operation and maintenance cost CT Page 4174 charges. The contract provides at § 503 that operation and maintenance cost charges for fiscal year 1983-84 and subsequent years are to be arrived at by taking the rates of the average daily flow actually discharged by Hamden into the WPCA's sewage treatment works, comparing the rates to the total flow received from all users, and multiplying the resulting percentage by the Net Operating Cost:
Section 503: Operation and Maintenance Cost Charges
 a. The Town shall pay annually to the City its proportionate share of Net Operating Cost. Beginning July 1, 1982 and continuing until the Completion Date the amount to be paid to the City by the Town shall be the mathematical average of the following two calculations (this provision shall be in lieu of and shall constitute the "interim agreement for FY 1982-83, 1983-84 and 1984-85" described in paragraph 5 of the Memorandum of Understanding Between the Town of Hamden Sewer Authority and the City of New Haven Water Pollution Control Authority, As Amended.)
 1. A calculation of the Town's share of Net Operation Cost calculated on a "systemwide" basis by taking the ratio of the Average Daily Flow actually discharged by the Town into the Sewage Treatment Works (including any flows discharged into the Town sewers by any feeder towns) to the total Average Daily Flow actually received by the Sewage Treatment Works from all waste water treatment service users. This percentage shall be multiplied by the Net Operating Cost of the system to determine the Town's proportionate share of the net Operating Cost under the "systemwide" basis.
* * *
 Commencing on the Completion Date the Town's proportionate share of Net Operating Cost shall be determined by taking the ratio of the Average Daily Flow actually discharged by the Town into the Sewage Treatment Works (including any flow discharged into the Town sewers by any feeder towns) to the total Average Daily Flow actually received by the sewage treatment works from all Waste Water Treatment Services users and multiplying the resulting percentage by the Net Operating Cost. This method shall be known as the "systemwide" approach. . . . CT Page 4175
Hamden's percentage for each year is no longer disputed, and it is set forth in the Joint List of Disputed Issues as a stipulated rate for each year. The disputes concern, rather, the components included in the Net Operating Cost by which Hamden's percentage is to be multiplied to arrive at Hamden's annual bill for the services received.
 Net Operating Cost is denied in Article I, § 101(v) of the contract as
 the total operation, maintenance and administrative costs incurred by the city for providing the Interceptor Sewer Services and Wastewater Treatment Services in such period, including debt services costs incurred in connection with short-term tax, grant or revenue anticipation borrowings undertaken directly or indirectly by or on behalf of the WPCA, less payments received from (i) grants and (ii) miscellaneous payments from other sources.
The parties agree that "Interceptor Sewer Services" refers to the large gauge interceptor sewer lines that extend from the Hamden/New Haven boundary at various metered points through which Hamden's waste water is transported to the waste water treatment plant on the East Shore, where it is processed in two stages before being discharged into New Haven harbor in a state that is hoped to comply with applicable state and federal regulations. During the early years of the contract, some of the actual processing of Hamden sewage took place at smaller treatment stations known as Boulevard and East Street, as well as at East Shore.
As to fiscal years 1983-84 through 1989-90, the WPCA calculated the Net Operating Cost for purposes of arriving at Hamden's bill in a manner that excluded two categories of costs: 1) billing and customer service for the WPCA's approximately 22,000 local New Haven customers and 2) all but $2,500 of the cost arising from collection and pumping for the local New Haven (as distinguished from the interceptor) sewers. The $2,500 was included to reflect the fact that some collection and pumping costs were associated with the interceptor sewers. These two categories of costs, that is, billing and customer service and collection and pumping, represent all of the costs associated with the local New Haven sewer system, as distinguished from the waste treatment operation. CT Page 4176
Pursuant to the contract, at § 505, Hamden was billed in two stages for the services for each year. The first bill was based on the WPCA's budget for the fiscal year. Hamden was to pay one-third of this bill on October 15, one-third on January 15 and one-third on April 15, within thirty days from the date of receipt of the bill. Within three months after the conclusion of the fiscal year on June 30, the WPCA was to provide a revised bill (referred to by the parties at trial as the "true-up" bill) recalculating the amount due based on the actual expenditures and the actual Hamden flow rate. Hamden claims that the phrase "actual expenditures" in this provision constituted an agreement by the WPCA to limit charges to Hamden to "actual expenditures" rather than to the Net Operating Cost, which may include more costs. This court finds that "actual expenditures" is, rather, an attempt to distinguish from the estimated bill issued initially, not a wholesale revision of the basis for the calculation of Hamden's bill. This construction gives effect to § 503 and harmonizes the contract's provisions to avoid either contradiction or the rendering of § 503 superfluous. Dugan v.Grzybowski, 165 Conn. 173, 179 (1973); Weil v. Beresth,154 Conn. 12, 19 (1966). This court finds that the use of the term "actual expenditures" in § 506 of the contract did not constitute a revision of the definition of Net Operating Cost but merely a means of describing the process of adjustment of the Net Operating Cost anticipated in each year's budget to the actual Net Operating Cost incurred in the year of operation for the purposes of determining Hamden's share, based on its proportion of the total flow.
Hamden paid its bills through the 1988-89 fiscal year without any objection to the method of calculation of the Net Operating Cost against which its proportional flow was multiplied for the purpose of calculating the charge to Hamden. During that period, the WPCA provided Hamden with access to annual audit reports and received no objection to the form or contents of those reports.
On May 15, 1990, the WPCA billed Hamden for the 1989-90 charges. (The evidence did not include any explanation why this initial bill was not sent in the fall of 1989 rather than in May). Hamden's mayor, John A. Carusone, sent the mayor of New Haven a letter (Exhibit 7) complaining that the estimated bill for 1989-90 exceeded the amount that Hamden had budgeted for its obligations under the contract. He demanded that the mayor of New Haven issue a bill only for the budgeted amount, and he raised CT Page 4177 issues as to whether certain revenues were reflected in the calculation of the figure on which Hamden's bill was based. New Haven's mayor responded in a letter reminding Hamden's mayor that its contractual relationship was with the WPCA, a separate statutorily-created entity that is not a department of the City of New Haven. The WPCA responded in detail to the issues raised by Hamden.
The relationship between Hamden and the WPCA deteriorated. Hamden's new Director of Finance, Louis Affinito, began to take positions that were not supported by any provisions in the contract but that proceeded from the view that Hamden should share in many forms of revenue to the WPCA but should not share in such operating costs as penalties for problems at the waste water treatment plant unless Hamden had directly caused the penalty to be incurred (Exhibit 9). Mr. Affinito questioned elements of Net Operating Cost that had never been questioned by Hamden until the charges began to exceed the amount that Hamden had budgeted for sewage disposal. Hamden further took the position that it would withhold its payments for sewer service for 1989-90 until New Haven resolved a claim made by Hamden for $368,411 that did not relate to obligations for sewer disposal services (Exhibit 7).
Hamden continued to refuse to pay $631,824 of the charges for 1989-90. The WPCA retaliated by taking the position that the charge to Hamden should be based on Net Operating Cost that included all costs associated with collection and pumping, not just the $2,500 estimated to be attributable to the interceptor sewers, and that Net Operating Cost should include the costs of billing and customer service for New Haven customers. In the midst of these disputes, for a twenty-two month period in 1992-1993, the WPCA employee responsible for issuing bills to Hamden inexplicably failed to do so. Hamden made no inquiry about the absence of bills and it made no payments at all between April 1992 and February 1994. For fiscal years 1991-92 to 1995-96 Hamden made payments in the amount of $2,400,000 each year, without regard for the fact that it had received bills indicating that higher amounts were due each of those years based on its percentage of the total flow and its corresponding portion of the Net Operating Cost.
The WPCA has provided Hamden with all waste water disposal services set forth in the contract without interruption from 1984 to the present, including all periods when Hamden did not make CT Page 4178 payments for such services.
The numerous disputes concerning the charges and payments are best organized into categories for discussion, as are the issues of special defenses and counterclaims reflected in the Joint List of Disputed Issues.
Furnishing of Audit as Condition Precedent to Payment
Hamden takes the position that it was not obligated to pay for ongoing sewage disposal services being rendered by the WPCA because the WPCA did not comply with an obligation to provide it with an annual audit. Hamden claims that the WPCA violated § 405 of the contract, which provides as follows:
 Section 405: Records, Accounts and Audits. The City shall keep books of record and account, in which complete and correct entries shall be made of all its transactions with the Town which, together with all other books and papers dealing with the Interceptor Sewer Services and Sewage Treatment Works Services, shall at all reasonable times be subject to the inspection of any officers or agent of the Town. The WPCA Fund shall be audited annually by an independent certified public accountant. Each such audit, in addition to the customary matters, shall show the income and expenditures related to the costs of providing Interceptor Sewer Services and Sewage Treatment Works Services to the Town.
The WPCA obtained an annual audit of its operations and furnished a copy of the audit reports to Hamden.
The audit reports concern the operations of the WPCA as a whole and do not identify separately the income and expenditures relating to interceptor sewer services and treatment of Hamden's sewage at the treatment plant. It is therefore not possible to check the calculation of the bill to Hamden merely by inspecting the annual audits, since the audits do not contain any calculations of the Net Operating Cost for interceptor and waste treatment, but reveal such figures only as part of the undifferentiated totals for operation and maintenance expenses.
The WPCA takes the position that since Hamden did not object to the form of the audit for several years, that form should be seen as in compliance with the description set forth in § 405. The objection to the form arose when a dispute developed CT Page 4179 concerning the calculation of the bill. Until there was a dispute as to whether the correct elements were included in the Net Operating Cost, there was no occasion to object to the audit. The development of the dispute spurred the complaint about the failure of the audit to supply the information in a separate analysis that would help resolve controversies.
Hamden claims that the completion of an audit exactly as described in § 405 of the agreement is a condition precedent that must be satisfied prior to Hamden having an obligation to pay for the processing of its sewage by the plaintiff. A condition precedent is a fact or event which the parties intend must exist or take place before there is a right to performance.Christophersen v. Blount, 216 Conn. 509, 512 (1990); Lach v.Cahill, 138 Conn. 418, 421 (1951); Pullman, Comley, Bradely Reeves v. Tuck-It-Away. Bridgeport. Inc., 28 Conn. App. 460, 467
(1992). "Whether the performance of a certain act by a party to a contract is a condition precedent to the duty of the other party to act depends on the intent of the parties as expressed in the contract and read in light of the circumstances surrounding the execution of the instrument." Christophersen v. Blount,216 Conn. 512; Ravitch v. Stollman Poultry Farms. Inc., 165 Conn. 135, 149
(1973); Lach v. Cahill, supra.
The wording of the contract does not express an intention of the parties to make the completion of an annual audit a condition that must be satisfied in order for the WPCA to be entitled to payment for its processing of all of Hamden's sewage. The provision concerning payment does not indicate that payment is conditioned on the preparation of the audit or that payment is due "provided that" the audit has been completed or "upon" its completion. See Pullman. Comely, supra, 28 Conn. App. at 467. Instead, the contract is worded in a manner that defines multiple duties to be performed by the WPCA in return for payment, with no one of those obligations identified as a condition precedent. In return for payment, the WPCA obligated itself primarily to process Hamden's sewage, and also to perform some other tasks including provision of audit materials, apparently to enable Hamden to verify its bills. If the WPCA failed to supply the audit, the remedy would be damages incurred for breach of that duty, and the measure of these damages would be the cost to Hamden of doing its own audit to obtain the information that was required to be provided. Hamden has not presented evidence to establish that it ever undertook its own audit of the cost of any such effort, and it has not identified the cost of performing its CT Page 4180 own audit as a claim for damages or offsets among its 109 claims.
Hamden has taken the further position that if the audit did not conform to the form specified in § 405 then Hamden should not have to pay a share of Net Operating Cost that is based on accounting expenses. The court is not persuaded by that claim. Even if the WPCA had asked its auditor to calculate and express separately in the report the elements of Net Operating Cost as applicable to the contract with Hamden, the auditor would also have had to audit the WPCA's accounts to reach total figures. Calculations of net amounts in a category necessarily are part of calculations of gross amounts. Moreover, the court was presented with credible testimony that the cost of an annual audit is properly included in operating costs for an enterprise and that it would not be feasible to isolate the portion of the audit expense that related to the interceptor services and waste water treatment plant as distinguished from the audit of the WPCA's operations as a whole. To the extent that Hamden is claiming that it should be charged with only the portion of the audit costs not related to those portions of the enterprise, it has failed to present any credible evidence as to what portion of the accounting bills related to those functions and what portion related to auditing of other functions.
The WPCA had identified as an issue a claim for recovery in quantum meruit in the event that the furnishing of an audit containing particular details was held to be a condition precedent to enforcement of the contractual duty to pay for services. Since the ruling is to the contrary, the issue of quantum meruit recovery is not reached.[1]
Hamden did not prove any consequential damages caused by the noncompliance with § 405 as to the form of the audits provided and did not list any such claim on the Joint List of Disputed Issues other than with regard to the claim that it should not pay a share of accounting expenses. The court finds in favor of the plaintiff as to these claims.
Claims Barred by Statute of Limitations
The WPCA claims that Hamden's claims that it was overcharged for fiscal years 1983-84 and 1984-85 are barred by the statute of limitations. Hamden's claims with respect to those years were asserted in a counterclaim which the WPCA concedes relates back to the date of the complaint, July 18, 1991. The limitation CT Page 4181 period applicable to claims based on a written contract is six years, pursuant to Conn. Gen. Stat. § 52-576. The claims relating to 1983-84 are clearly barred. Since the bill for 1984-85 was issued; on December 12, 1984, and since fiscal year 1984-85 ended on June 30, 1985 and no claim based on the billings for that period was made before July 18, 1991, the statutory bar applies to the claims made as to that year as well.
Hamden has claimed that the statute of limitation was tolled because the WPCA fraudulently concealed the facts necessary for it to realize that it had a claim against the WPCA. Proof of fraudulent concealment sufficient to toll the statute of limitation must be by clear, precise and unequivocal evidence that the WPCA intentionally concealed facts that it knew were necessary to establish this cause of action. Bound BrookAssociates v. Norwalk, 198 Conn. 660, 665-666 (1986); Beckensteinv. Potter Carrier, Inc., 191 Conn. 150, 163 (1983); Puro v.Henry, 188 Conn. 301, 311 (1982).
Hamden claims that the WPCA failed to furnish it with an audit that complied with § 405 as to 1983-84 and 1984-85 and that this failure constituted fraudulent concealment of improper calculation of its bill. Hamden acknowledged that it received audits for those years. Any claimed deficiencies in those audits were therefore known to Hamden at the time. Hamden did not present any evidence that it had ever requested answers to questions concerning the calculation of its bills for those years. Indeed, the evidence was uncontroverted that Hamden raised no objection to the bills issued to it for those years. Hamden asserts that the WPCA "knew" that the 1983-85 bills were not calculated on the basis that Hamden asserted in 1990 was erroneous. The WPCA had never before been made aware of any such claim, and this court finds that it acted at all times from a good faith belief that Hamden had begun in 1990 to interpret the agreement in a manner inconsistent with the actual provisions of the agreement. The WPCA never refused to allow Hamden inspection of its accounting records on which the calculation of Hamden's bill was based, though the parties did disagree as to the method in which inspection should take place. The defendant did not file a special defense raising the statute of limitation as to the plaintiff's claim. See Practice Book § 164. Accordingly, any such defense to the plaintiff's claims as to 1984-85 has been waived. Orticelli v. Powers, 197 Conn. 9 (1985). CT Page 4182
The court's findings have been reflected in corresponding dispositions of Hamden's Issues 1 through 11 on a copy of Exhibit 13, the Joint List of Disputed Issues.
Sludge Ticket Revenue
Hamden claims that the charges for fiscal years 1985-86 through 1995-96 are based on a figure that erroneously failed to give Hamden partial credit for revenues received by the WPCA for processing septage (that is, sewage and other wastes pumped from septic tanks and other locations and delivered to the WPCA's facility by truck rather than through the sewer lines.) The only provision in the contract that specifically applies to septage is § 403. That section of the contract provides that the WPCA will "obtain payment for its acceptance of Septage directly from the Persons who deliver it, and shall not bill the Town or any Feeder Towns for such Septage."
Neither this nor any other provision of the contract entitles Hamden to a share of revenues from processing septage, however, the provision cited above indicates that the WPCA was to make septage operations self-sustaining, such that any expenses caused by receipt of such materials would be borne by those who delivered the materials through payment of fees, and the costs would therefore not be allocated to Hamden or any other user. The evidence did not establish that the cost of processing such septage was deducted from Net Operating Cost in calculating Hamden's bill. Since the charges for processing the septage were to have paid for the cost of processing it, Hamden has correctly claimed that the revenue figures may be used as cost figures and that Hamden was erroneously billed for this cost.
The court has noted its finding that Hamden has prevailed on those claims in its notations as to Issues 12, 18, 25, 32, 42, 55, 65, 73, 83, 92 and 101 on the copy of; Exhibit 13.
Credits for Interest Earned
Hamden claims that as to fiscal years 1985-86 through 1995-96 it was charged on the basis of Net Operating Cost that failed to give it credit for a portion of the interest earned on customer receivable. As has been explained above, the contract provides a formulation for arriving at charges to Hamden that is based on Net Operating Cost, which is defined in § 101(v), quoted above. That definition provides for subtraction from the defined CT Page 4183 costs of (i) grants and "(ii) miscellaneous payments from other sources." The contract contains no definition of such "miscellaneous payments" nor any illustration of the kinds of payments intended. Where contract terms are ambiguous, as this one is, they should be construed according to the usual meaning of the words used but in a manner consistent with the contract.Swayze v. Swayze, 176 Conn. 323, 332-33 (1978); New Haven SandBlast Co. v. Dreisbach, 102 Conn. 180 (1925). If "miscellaneous payments" meant all receipts of the WPCA, the Net Operating Cost would exclude all payments by New Haven customers and payments by Woodbridge and East Haven, a nonsensical interpretation that might well wipe out any costs at all to Hamden. Interest on receivables from local New Haven customers is not a "payment" from another source (as might be, for example, a payment of money damages for causing damage to an interceptor sewer line). Rather, such interest relates to the management of the revenue of local New Haven customers. There was no indication in the evidence to establish that interest from receipts was treated in budgets, audits, or otherwise as "miscellaneous payments." Hamden has failed to discharge its burden of proof with regard to this claim for offsets.
The court finds in favor of the WPCA as to Issues 13, 19, 26, 33a, 38, 43a, 56a, 66a, 74a, 84a, 93a, and 102a.
Replacement Reserves
Hamden claims that its charges should not have included amounts to be put in a fund to pay for replacement of equipment below the level of expenditure that would be funded by bonding. Hamden also claims that its charges should have included a credit for a share of the interest earned on the funds in that account. Accounting experts presented by the WPCA testified that it is a necessary operating cost to replace equipment and to include in a budget funds for that purpose. Though the cost of replacement may be said not to have been "incurred" within the meaning of § 101(v) until the replacement has actually taken place, the plaintiffs' witness credibly explained that the WPCA cannot simply wait for equipment to break down and then bill its customers, including Hamden, to raise funds for the replacement. Instead, because of the need to keep the sewage treatment plant in constant operation, the WPCA must incur the cost of replacing equipment in advance by building up a fund from which replacements can be bought as needed to continue operations. Hamden did not present evidence that expenditures from this fund CT Page 4184 were for functions other than the interceptor sewer services or the waste water treatment services. Since the replacement reserve fund is properly included in the Net Operating Cost as defined in § 101(v), the court finds in favor of the plaintiff as to claims 31, 41, 54, 64, 72, 82, 91, 100 and 109. With regard to Issues 54, 72, 100 and 109, Hamden has listed separately the amount actually expended from the replacement reserve account and the amount charged to it from what those expenditures were made. The WPCA has taken the position that since Hamden was charged for the contribution to the account, no credit should result to the WPCA for the amounts spent from that contribution. The court has reflected this position on Exhibit 13.
The parties' stipulations in Exhibit 13 reveal that Hamden has in fact been charged for replacement reserve costs since 1988-89. Since Hamden did not make any payment for the 1988-89 fiscal year until May 26, 1989, when the year was nearly over, its $50,000 payment for the replacement reserve fund cannot be said to have been earning interest. Following the same interpretation of the "miscellaneous payments" provision in § 101(v) as has been detailed above, since the interest can be considered to be payments not by "other sources" but only from the WPCA's customers, no offset is required by the contract as to the period between April 1992 and February 1994. There was no indication that such interest was ever identified as a "miscellaneous payment" in the audits or budgets of the WPCA. Hamden has failed to prove that interest receipts come within the contract language, and no entitlement to an offset has been proven.
The court finds for the plaintiff as to issues 31, 33(b), 41, 43(b), 54, 56(b) 64, 66(b) 72, 74(b), 82, 84(b), 91, 93 (b) 100, 102(b) and 109.
Legal Fees for Zimpro and CDM Suits
After the East Shore waste water treatment plant was built, the WPCA sued two entities in connection with claims of defects in the capacity of the system as built, referred to as the "Zimpro" and "CDM" suits. This litigation was pending at the time the parties entered into the contract in 1984, however, no specific mention of the costs associated with it appears in the contract. The WPCA included the legal fees incurred when it calculated the Net Operating Cost for Hamden in the first year's bill (1983-84). Based on the opinion of an unnamed consultant, CT Page 4185 such legal fees incurred for 1984-85 and 1986-87 were not, however, included in calculating Hamden's bills for those two years. Such fees were again included as part of Net Operating Cost in the 1985-86 and 1987-88 billing and for each year through 1991-92. The WPCA won the suits and recovered both cash and services in lieu of cash, as set forth in the stipulation in Exhibit 13.
Hamden takes the position that the legal fees as to the CDM and Zimpro actions should not be included in Net Operating Cost but that it should get a credit for the proceeds from that litigation against the Net Operating Cost in the years when the suits yielded payments, which Hamden apparently claims are "miscellaneous payments" within the meaning of § 101(v).
This court finds that the two suits involved the operation of the waste water treatment services of the WPCA and that such legal fees were an operating expense properly includable each year in the Net Operating Cost. The court also finds that the proceeds from the suits and interest earned from those proceeds constitute "miscellaneous payments" which should reduce the Net Operating Cost for each year they were received, such that Hamden would share both in the costs and the recoveries in the CDM and Zimpro suits.
Accordingly, the court finds for the plaintiff as to Defendant's Issues 15, 28a, 28d, 35a, 35d, 47a, 47c, 60a, 66(c), 70a, 88a, 97a, and for the defendant as to Defendants' Issues 37, 43c, 49, 56(c), 61, 74(c), 84(c), 93(c) and 102c and as to Plaintiff's Issues 5, 6, 8, 9, 10 and 11. The court finds for the plaintiff as to Plaintiffs' Issues 1, 3A and 3C. The defendant did not establish that the claim set forth as Defendant's Issue 81 was not also included in CDM receipts, and it should not receive credit both for the receipt and the expenditure of that receipt. Accordingly, the court finds for the plaintiff on Issue 81.
Collection and Pumping
Since the definition of "Net Operating Cost" indicates that the applicable costs are those associated with the interceptor sewers and the treatment plant, as opposed to all operating costs of the WPCA, the WPCA recognized in the first bill it issued to Hamden that costs associated with collecting and pumping other than for the interceptor services, that is, costs for collecting CT Page 4186 and pumping sewage in the local New Haven sewer system, should not be included in the Net Operating Cost. After Hamden refused to pay its full bill in 1990 and as disputes between the parties became more acrimonious, the WPCA decided that it would no longer "back out" collection and pumping costs from the calculation of Hamden's bill but would include it in the "true up" bill for 1989-90 and thereafter.
The court finds that the original exclusion of this cost from Net Operating Cost was an accurate construction of the words of § 101(v) and that Hamden had not contracted in Exhibit 3 to pay a portion of the costs for collecting and pumping in the local New Haven sewers.
Accordingly, the court finds for the defendant as to Defendants' Issues 44, 57, 67, 75, 85, 94, and 103.
Hamden also claims that in 1986-87 the WPCA erred in calculating the expenses associated with local New Haven collection and pumping and that the WPCA over-excluded such costs. Since the parties have so stipulated, the court finds in favor of the plaintiff as to Defendant's Issue 20.
Billing and Customer Service
Part of the total operating costs of the WPCA each year derives from the process of billing and providing customer service to the approximately 22,000 local New Haven sewer customers. When the WPCA issued its first bills to Hamden, it did not include such costs in the calculation of Net Operating Cost as defined in § 101(v). When hostilities broke out, the WPCA claimed that such costs were properly included and issued bills to Hamden that included such costs in calculating the figure that was multiplied by Hamden's proportion of the total flowage. The court finds that these costs are not within the contractual definition of "Net Operating Cost" and finds in favor of the defendant as to Defendant's Issues 14, 21, 45, 58, 68, 76, 86, 95 and 104.
Reimbursement to CONH
As part of its operations, the WPCA uses the services of various departments and offices of the City of New Haven (which the parties have denominated "CONH" in their stipulations and Joint List of Disputed Issues.) The WPCA is an entity created by CT Page 4187 statute, Conn. Gen. Stat. § 7-246. It is legally separate from the City of New Haven. It received services from offices and employees of the City of New Haven and was therefore billed for those services. The defendant has not proven that such services were for functions other than the interceptor sewer system or the waste treatment plant itself, and witnesses for the WPCA testified that the services related to the administrative tasks of operating the waste water treatment plant performed by people employed by the City of New Haven rather than by WPCA employees. The defendant had the burden of proving its counterclaims and of establishing that the charges for services performed by the City were not within the contractual definition of Net Operating Cost and were therefore improperly included. The defendant failed to discharge this burden of proof but left the matter as an unsupported claim. The defendant did not present evidence to support its supposition that the services from the City's offices were partly related to the local New Haven sewers or that they were related to local New Haven sewers in the same percentage that local costs bore to the total costs of the WPCA. Accordingly, the court finds in favor of the plaintiff as to Defendant's Issues 16, 23, 29, 38, 50, 62, 70g, 79, 89, 98, and 107.
Legal Fees (Other than Zimpro and CDM)
Hamden has taken the position that certain fees incurred by the WPCA for legal representation and advice were improperly included in the Net Operating Cost figure for various years. The appropriateness of such inclusions depends on whether each expense was part of "the total operation, maintenance and administrative cost incurred by the City for providing Interceptor Sewer Service and Waste Water Treatment Services" pursuant to the contractual definition of § 101(v). The WPCA has claimed that it erroneously failed to include certain legal expenses in its billing for certain years and seeks now to recover Hamden's share.
This court finds that some of the legal fees at issue, specifically, those identified as Hamden's issues 28(b), 28(c), 35(b), 47(b), 47(d), 60(b), 70(b), 70(c), 70(f), 78(a), 78(d), 78(e), 78(g), 78(h), 78(i), 88(b), 88(e), 88(g), 88(h), 97(b), 106(a), 106(d) and 101(f) and WPCA Issue 3(b) concern legal fees incurred in connection with labor issues that related to the operation of the waste water treatment plant (and, during 1987-88, the East St. facility that was then receiving CT Page 4188 Hamden sewage), legal advice concerning the business and operation of the plant, defense of administrative enforcement actions by the Department of Environmental Protection and litigation by an environmental group, Connecticut Fund for the Environment, concerning the waste treatment plant's compliance with standards and regulations. All of these expenses are administrative expenses that relate to the operation of the waste water treatment plant and were properly included in Net Operating Cost. The court finds in favor of the plaintiff as to those claims.
The WPCA has claimed as its Issue 3(b) that Hamden should have been charged its portion of legal fees incurred in connection with defense against an enforcement action by the DEP during the 1986-87 fiscal year. Since that expense related to the operation of the waste water treatment plant, the court finds that it was an expense that, pursuant to § 101(v) and § 503 of the contract, should have been included in calculating Hamden's bill and that it was not. Accordingly, the court finds in favor of the WPCA on its Issue 3(b).
Some of the legal expenses questioned by Hamden related to claims made concerning the local New Haven sewer system, specifically, claims for damages for back ups in that system. Since the maintenance and operation of the local New Haven sewers is excluded from the definition of Net Operating Cost, these charges were not properly included in calculating charges to Hamden. The court finds in favor of Hamden as to its Issues 35(c), 70(e), 78(c), 78(f), 88(d), 88(f), 97(d), 106(c), 106(e), and 106(g).
The final category of legal fees is those incurred by the WPCA in addressing its disputes with Hamden over nonpayment of bills. Hamden claims that these expenses were not properly included in Net Operation Cost as defined in § 101(v). This court disagrees. Legal advice and services to secure revenue was a part of the operating cost of the operation of the waste water treatment plant just as the salaries of the persons employed there to do various kinds of paper work concerning other sources of revenues (other than billing local New Haven customers) was part of such costs.
While it is clear that under the American Rule parties bear their own legal costs in litigation, that rule may be varied by contract. In some cases contracts explicitly provide for a CT Page 4189 shifting of legal costs of collection. The contract between the WPCA and Hamden provides for partial recovery in another way, that is, the inclusion of such an administrative cost as part of the Net Operating Cost. The court finds in favor of the plaintiff as to Hamden's Issues 60(c), 70(d), 78(b), 88(c), 97(c), and 106(b).
Hamden has withdrawn its Issues 78(e) and 78(j), which also concerned legal expenses.
It is interesting to note that while Hamden took the position that it should not have to pay a share of legal fees incurred in responding to enforcement actions concerning the treatment of waste water since it had not violated the regulations, Hamden did not urge applying the same principles to legal fees incurred by the WPCA because Hamden had failed to pay its charges, though such fees could certainly be seen as having been caused by Hamden alone rather than by all users of the WPCA's facilities. At any rate, as the court has noted, the issue is not which user caused which expense to the WPCA, but whether the expense is part of Net Operating Cost as defined in § 101(v) of the contract. Neither that provision nor any other provision in the contract provides for allocation of expenses to the user that caused them; instead, § 503 requires Hamden to pay a portion of defined Net Operating Cost corresponding to its percentage of the total volume processed. Other users will thus pay approximately 79% of the cost of legal fees that could be viewed as having been caused by the conduct of Hamden.
Accounting Expenses
Hamden claims that expenses for the services of outside accountants should not have been included in Net Operating Cost for purposes of calculating annual charges to Hamden. This position apparently proceeds in part from Hamden's claim that the WPCA did not prepare the kind of audit described in § 405 of the contract, and the argument is that Hamden should therefore not have to pay any part of other kinds of accounting performed. This court finds that expenses for accounting, including audits, were a necessary part of the administrative costs of operating the waste water treatment plant, that they were properly included in the Net Operating Cost, and that Hamden's disapproval of the degree of detail and form of the audits does not remove the expenses from the operation of this definition in the contract. The contract does not provide that Hamden is not liable for a CT Page 4190 share of expenses if it disapproves of the method of performance of the services at issue and Hamden did not prove that it incurred expenses to secure performance. The court finds in favor of the plaintiff as to Hamden's issues 11, 17, 24, 30, 40, 52, 63, 71, 80, 90, 99 and 108.
Fixed Asset Study
Hamden claims that it should not have to pay a proportion of the cost of the preparation of a fixed asset study commenced by the WPCA in 1989-90. The plaintiff established by credible evidence that as part of the accounting of a large operation such as its plant, a study of assets must be completed from time to time as a tool in financial planning. The court finds that such an expense is an administrative expense as defined in § 101 (v) (Net Operating Cost) and finds for the plaintiff as to defendant's Issues 36 and 48.
Penalties
From time to time since 1984, in connection with enforcement actions by environmental authorities, the WPCA has had to pay penalties for violations of the permits and licenses under which it operates. There is no way of determining whether the violation was the result of flow from Hamden or from some other user of the system, and the payment of such penalties is part of the overall expense of operating a waste water treatment facility. When Hamden's nonpayment and questions over the calculation of its bill led to a wholesale review of past billings, the WPCA discovered that it had failed to include penalties in the charges to Hamden for 1987-88. There was no evidence to suggest that this omission had resulted from any provision in the contract, rather the WPCA omitted the item on the basis of a note from a consultant whose identity and reasoning is not known. While Hamden correctly points out that penalties may not be included in operating expenses for such purposes as federal taxation of a business, the contract between the parties does not adopt any such exclusion, and the issue remains whether penalties are part of Net Operating Cost as defined in § 101(v) and § 503.
There was no evidence to suggest that the penalties were for operation of the local New Haven sewer system rather than for the waste water treatment operation. The court finds in favor of the plaintiff as to WPCA Issue 4 and Hamden Issues 39 and 53. CT Page 4191
Tweed-New Haven Expenses
The WPCA included in Hamden's bill for 1989-90 a portion of a $225,000 charge for an amount paid by the WPCA to the City of New Haven. According to documents contained in Exhibit L, this payment was in resolution of a claim that originated in June 30, 1983. The City of New Haven had for several years advanced funds to the WPCA because of deficits in 1979-80 and 1980-81. As part of the claimed amounts due, the City agreed to apply $225,000 of the proceeds from the sale of surplus land at Tweed-New Haven airport as a reduction of the debt from the WPCA. The City later regarded that arrangement as null and void on the ground that federal law required use of the funds for airport purposes only and demanded that the WPCA pay the $225,000 from its own funds.
In essence, then, the $225,000 was a repayment by the WPCA to the City for advances to meet operating costs in years before the 1984 agreement at issue in this case.
In the contract, at § 503(a), Hamden agreed to pay a share of the Net Operating Cost for the fiscal year July 1, 1982-1983 and thereafter. Hamden did not agree to pay for operating expenses for prior years. Though the WPCA did not include the $225,000 in its charges until 1989-90, the charge was neither a capital nor an operating cost applicable to that year but a repayment of operating charges for 1979-80 and 1980-81. The contract on which this suit is based did not contain any agreement by Hamden to pay a portion of such a charge. The court finds in favor of the defendant as to its Issue 51.
Undercharge for 1985-86
The WPCA claimed that it had failed to include in its net operating expenses for which Hamden was billed its proportional share for 1985-86 some expenses paid from restricted accounts. The trial balance for that period was not located, and the plaintiff did not question Scott Kennedy, the accountant who presented much of the evidence as to calculations, with regard to this claim. It was not proven that these expenses were not included in the total as well as being reported as having been paid from restricted funds The court finds that the plaintiff did not present either documents or testimony to support its claim as stated in WPCA Issue 2, and the court finds for the defendant as to that claim. CT Page 4192
Bad Debt
Hamden objects that part of the Net Operating Cost on which its bill has been based had for several years at issue included as an expense a figure for bad debt. The bad debt figure for some years has been stipulated as having been the product only of nonpayments by New Haven customers. In other years, one of the elements of the bad debt figure is Hamden's own nonpayments. Hamden takes the position that bad debt is not part of the "total operation, maintenance and administrative cost incurred by the City for providing the Interceptor Sewer Services and Wastewater Treatment Services" within the meaning of § 101(v) of the contract. Hamden claims that bad debt of New Haven customers is, instead, a cost of operating the local New Haven sewer system.
The issue is whether bad debt of New Haven customers is an expense "incurred by the City for providing Interceptor Sewer Services and Wastewater Treatment Service." The unpaid bills of New Haven customers are not limited to charges for use of the local sewers that convey their waste to the East Shore plant but include charges for the processing of sewage, that is, for the operation of the waste water treatment plant.
All of the accountants who testified on this subject, including an accounting professor from the University of New Haven who testified on behalf of Hamden, testified that bad debt is properly treated as an operating expense incurred by the WPCA. While bad debt may at first glance be conceptualized as an absence of revenue, the witnesses all agreed that bad debt is, instead, an expense of conducting a business in which customers are charged for services. The contractual definition of Net Operating Expenses clearly is phrased in terms used in accounting, and there is no indication that the WPCA and Hamden agreed to have the words of that definition construed other than as commonly applied to the calculation of costs in a business setting using generally accepted accounting procedures.
Unpaid bills to New Haven customers obviously include some charges that relate to the waste water treatment and some that relate only to the New Haven local services. The latter portion is not an expense "incurred by the City for providing Interceptor Sewer Services and Wastewater Treatment Services." The parties agreed at a post-trial oral argument that the "strictly New Haven local sewer" portion of bad debt is the same percentage of the CT Page 4193 total New Haven bad debt as the charges for billing and customer service and collection and pumping for the local New Haven sewer are in relation to total WPCA expenses. The calculation for each year (generally reflecting that the portion of expenses related strictly to the local New Haven sewer is about ten percent) is set forth in Exhibit 13 and is adopted by the court to reflect that Hamden must bear a share only of the New Haven bad debt expenses that relate to interceptor and waste treatment portions of the operation.
With regard to Hamden's claim as to bad debt resulting from its own nonpayments, the issue is clear. By operation of the contract, Hamden is obligated to pay for expenses for providing interceptor sewers and the waste treatment plant. Bad debt caused by Hamden was, for the various years in which it occurred, therefore necessarily a cost of operating the interceptor system and waste water treatment plant, and the cost of that bad debt was included in charges to all customers at the time. By operation of the contract, Hamden pays only the fraction of the bad debt expense that corresponds to its annual flow rate. The WPCA has pointed out that when this bad debt created by Hamden is recovered, Hamden, like all other customers, will share through the accounting process in the benefits of its recovery and therefore will not pay for bad debt both as an underpayment of its bills and as a bad debt operating expense arising from the same nonpayment. (Similarly, Hamden will share in any recovery of bad debt from other customers through the accounting procedure applicable to recovery of bad debt.)
Issues 96(b) and 105(b) concern the inclusion of bad debt for other interlocal customers in the Net Operating Cost. Since that bad debt is incurred by the WPCA as an expense of operating the interceptor sewers and the waste treatment plant, it is properly included in Net Operating Cost for the calculation of Hamden's bill, such that Hamden, the local New Haven customers, and the other interlocal users pay portions of this expense for providing interceptor sewers and the waste treatment plant.
The court finds in favor of the plaintiff as to Hamden's Issues 22, 27, 34, 46(a) and 46(b), 59(a) and 59(b), 69(a) and 69(b), 77(a) and 77(b), 87(a), 87(b), 96(a), 96(b), 96(c), 105(a), 105(b), 105(c)
Withdrawn Claims
CT Page 4194
The WPCA has withdrawn its claims as to WPCA Issue 7. Hamden has withdrawn its claims as to Issues 78(e) and 78(j).
Underpayments
When the adjudications as to each of the issues listed in Exhibit 13 is applied, the adjudicated correct annual bill is determined for each year. Subtraction of stipulated actual payments for each year results in the determination of the amount due for each year. Findings in favor of the defendant on various issues have thus created credits in favor of Hamden, while findings in favor of the plaintiff as to the issues it raised have increased the amount due before credits and payments are applied. The court has noted each such finding and the total balance found to be due for each year at issue.
The court finds that the following amounts are due the plaintiff as to the fiscal years as indicated.
 1983-84 $ 0 1984-85 44,154 1985-86 14,962 1986-87 370,220 1987-88 266,606 1988-89 316,707 1989-90 605,638 1990-91 799,891 1991-92 423,370 1992-93 1,200,036 1993-94 362,586 1994-95 523,280 1995-96 997,644
Total $ 5,925,094
Judgment shall enter in favor of the WPCA in the principal amount of $5,925,094.00, plus interest, calculated at the rates stipulated to by the parties in the interest chart appended to Exhibit 13. The total amount of interest due is $1,992,268.00, with annual calculations reflected on Exhibit 13. This judgment reflects all offsets made for all of the counterclaims proven by the defendant. The plaintiff shall recover its court costs upon application to the clerk of the court.
Beverly J. Hodgson CT Page 4195 Judge of the Superior Court